Lawrence DANIELS, Respondent,

v.

Calvin BANNING, Appellant.

No. 47289.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Rehearing Denied Dec. 14, 1959.

W. K. Gibson, Sedalia, for appellant. Martin, Gibson & Gardner, Sedalia, of counsel.

William J. Cason, Clinton, William E. Neff, Warsaw, for respondent.

COIL, Commissioner.

Lawrence Daniels, plaintiff below, was injured when he fell while assisting in moving a boat dock from the Lake of the Ozarks through a channel to White Branch Cove. A jury awarded him $8,500 as damages for personal injuries in his action against Calvin Banning, the owner and operator of the dock, and Banning's employee, Carl Jackson. Calvin Banning alone has appealed from the ensuing judgment.

Banning contends first that the trial court erred in refusing to direct a verdict for him on the ground that the evidence showed plaintiff was injured by the alleged negligent act of a fellow servant for which he as the employer was not liable.

On May 31, 1956, and for some time prior thereto, Banning owned and operated the White Branch Resort and public boat dock at a place about a mile southeast of Warsaw, Missouri. The usual location of the dock was in a cove which connected with the Lake of the Ozarks by a channel about 100 yards long and 20 to 30 feet wide. The cove was about one-half mile long and was of irregular widths varying from 250 to 300 yards. Codefendant Jackson was Banning's servant and employee and was in

complete charge of the dock. For some time prior to May 31 there was insufficient water in either the cove or channel to permit boats to operate from the dock located in the cove. As a result Mr. Banning had moved the boat dock (about 150 feet long made up of sections of different lengths) to a place in the lake adjacent to its east shore at a point a short distance south of the mouth of or lake entrance to the channel. On May 31, Mr. Jackson, as Banning's dock foreman, was supervising and aiding a crew who were building a new boat dock section near the place where the dock described above was located. The dock under construction was to accommodate two houseboats and was in the shape of the letter E, and was near completion at the time of the occurrence in question. Several other new dock sections had been built immediately prior to May 31 at that place and, in connection with their construction, a number of 55-gallon steel drums had been accumulated there to be used under the wood dock platforms to keep them afloat. Some of those drums, for one reason or another, leaked and were not, until repaired, suitable for use. Those had been put aside as "leaker" drums to be thereafter repaired and used.

About noon on May 31 Jackson noticed that the lake was rising rapidly and by 3:30 or 4:00 o'clock it became apparent that it would rise to an extent that the boats and dock in their positions in the lake would be endangered by the high water and the consequent debris. Acting thereon, Jackson and his crew, and perhaps some others, began moving the boats into the cove. They were assisted by their employer, Mr. Banning. When most of the boats had been moved the dock sections were moved from the lake into the cove. A section would be moved by unhooking the cable which held it to the other sections, then permitting the current to carry it into and through the channel and into the cove, where a boat would push the dock to its regular location on the opposite bank. In order that the dock might go through the channel without

mishap, men stationed themselves at various places on the dock, each with a two-by-four or an oar, and attempted to pole the dock section away from the banks of the rather narrow channel.

Other evidence set forth from the standpoint most favorable to plaintiff justifies the following statement. Plaintiff was well acquainted with defendants Banning and Jackson and was aware of the fact that Banning's boat dock was temporarily located in the lake, and, when he realized at 6:30 or 7:00 o'clock on the 31st that the lake was rising, he went to Banning's dock to determine whether he might be of assistance in rounding up additional help which plaintiff anticipated might be needed to move the boats and dock. At that time he did not have in mind that he would assist in the moving work. When he arrived, as we understand, at Banning's dock, all the boats had been moved into the cove except two cruisers and two houseboats, and one of the cruisers was then proceeding through the channel into the cove. Mr. Jackson, the dock foreman, and Mr. Banning, the owner and operator, were both present and were working in and around the dock. Plaintiff spoke to Mr. Jackson, who stated that they were shorthanded and could use all the help they could get. About that time Mr. Banning, who was on one of the houseboats at the dock, getting ready to move it through the channel into the cove, called (apparently to his foreman Jackson) for some help in moving the houseboat, whereupon Jackson asked plaintiff if he would help Mr. Banning with it. Plaintiff assented and went to the boat and helped Mr. Banning move it through the channel into the cove, and thereafter, throughout the rest of the evening, continued to work under the instructions of both Jackson and Banning, moving the remaining boats and some of the dock sections into the cove.

Plaintiff was not paid for his work, did not expect to be paid, did not ask for pay, and his name was not on Mr. Banning's payroll. Sometime, either prior to or after plaintiff's arrival, dock foreman Jackson

kicked or shoved the "leaker" drums into the lake, believing that the current would carry them into and through the channel, and that they would then drift across the cove where they could be recovered the next day. Irrespective of whether such was done prior or subsequent to plaintiff's arrival, the act of placing or kicking the drums into the lake was not done in plaintiff's presence and he had no knowledge whatever that Jackson had placed those drums in the lake so they would go into the channel. No one told him that such was to be done, had been done, or that those drums or any of them might be encountered in the channel or the cove as a boat or dock section moved from the lake to the cove. Plaintiff assisted in taking the remaining boats through the channel and had assisted in taking two or three dock sections through without any untoward event and without encountering any obstruction of any kind.

The dock on which plaintiff was standing at the time of the accident in question was the nearly completed E-shaped dock which was about 10 feet long and 20 feet wide at its widest place. As one stood on the dock with the prongs of the E to his left, there was a four-by-eight section which had not been completely covered with planking. Across the center of that open space was one two-by-ten plank which ran from the extreme left edge of the E prong across the width of the dock. There was no railing around the dock platform. Plaintiff and four others placed themselves at various places on the dock, each with a two-by-four or a boat oar, preparatory to moving it through the channel. Plaintiff stood at the left front with his right foot on the two-by-ten plank and his other foot braced against the joist to his left. The dock section proceeded into the channel without event. It was dark at the time and there were no lights in the channel and no one was using a flashlight. The speed of the water was five to ten miles per hour. When the dock had traveled two thirds the distance through the channel, plaintiff saw to its left front a partially submerged drum,

about 12 inches of which was visible above the water. It was then about four feet from the front edge of the dock and six feet from plaintiff. Plaintiff shouted a warning and immediately the raft collided with the drum with considerable force. Plaintiff was knocked from his feet and thrown so that he was in a position with the side of his neck across one of the joists and his left leg hooked over another, and the water under him sort of tending to pull him under. Someone shouted that the raft was breaking up and advised everyone to jump. Plaintiff somehow removed himself and got on the left bank of the channel. The drum with which the dock collided was one of the "leaker" drums which the foreman had placed in the lake and which thereafter had lodged in the channel.

Appellant contends that the relationship of master and servant existed between him and plaintiff; that Banning's only submitted negligence was the averred negligence of his employee and servant, Jackson; that Jackson was plaintiff's fellow servant and therefore Banning, as the employer-master, was not liable because the fellow servant doctrine (pleaded by Banning) exempted him from liability for injuries to his servant as a result of the negligence of a fellow servant.

We shall, for the purposes of this case, assume without deciding that, as appellant contends, plaintiff was a fellow servant or employee with dock foreman Jackson at the time plaintiff was injured. We make that assumption because, even so, in our view the fellow servant doctrine does not apply to the facts of this case, but, on the contrary, Mr. Banning, the employer, was liable to plaintiff for the negligent acts of his employee Jackson.

■ It is apparent from the facts heretofore stated that Banning's negligence (submitted and upon which plaintiff recovered) was the independent act of employee Jackson which independent act, i. e., kicking the "leaker" drums into the lake (under the circumstances hypothesized in

plaintiff's instructions) was not connected with the particular work being performed by plaintiff at the time of his injury or with any work plaintiff had been instructed to perform. Plaintiff had nothing to do with kicking or placing the "leaker" drums in the lake and knew nothing whatever about it, did not observe Jackson at the time he did it and had no opportunity to do so. Plaintiff had no employment which had anything to do with the employment by virtue of which Jackson performed the alleged negligent act in question. There was a total absence of any fellow servant relationship between plaintiff and Jackson in the work Jackson performed when he kicked the "leaker" drums into the water. Plaintiff and coemployee Jackson were not so associated in a common employment at the time of Jackson's alleged negligence that plaintiff could have observed him or could have been in a position to have influenced Jackson's conduct or to have attempted to have corrected or prevented the proposed negligent act. In Propulonris v. Goebel Const. Co., 279 Mo. 358, 368, 213 S.W. 792, 795[4–7], this court said:

"Appellant argues that the plaintiff is not entitled to recover in this case because the work of constructing the scaffold was done by Clark, and Clark, it is claimed, was the fellow servant of the plaintiff. It is true, at the time the scaffold gave way Clark and the plaintiff were fellow servants. They were working together in the same kind of work and assisted each other in taking down the timbers comprising the form. But Clark was a carpenter; that was the general work which he did. Plaintiff was a common laborer. Clark had constructed the scaffold on which they were working before this particular work began, and plaintiff had nothing to do with it and knew nothing about it. There was an entire absence of relation of fellow servant in the work of constructing the platform. The test of the relation as laid down is: Was the employe injured and the one inflicting the injury so associated in their work that each could observe and influence the other's conduct and

report any delinquency to a correcting power, or head? Koerner v. St. Louis Car Co., 209 Mo. 141, loc. cit. 154, 107 S.W. 481, 17 L.R.A.,N.S., 292; Parker v. Hannibal & St. Joe Ry. Co., 109 Mo. 362, 19 S.W. 1119, 18 L.R.A. 802; Stapleton v. Hummel Mfg. Co., Mo., 202 S.W. 369, loc. cit. 370." See also Robbins v. Olson-Schmidt Const. Co., Mo.App., 215 S.W. 779, 780[1]. And it is well settled that the fellow servant rule is not applicable when the coemployees are not engaged in a common employment, "that is, work of the same general character or such as to bring them into necessary and frequent contact; and in determining the question of common employment consideration is sometimes given to circumstances such as exposure to or apprehension of injury from the other servants, and ability to take precautions." 56 C.J.S. Master and Servant, § 331a, p. 1094. See also 35 Am.Jur., Master and Servant, § 380, p. 803, § 381, p. 805.

It is true that the Propulonris case, supra, states, as we understand, as an additional reason for the nonapplicability of the fellow servant doctrine the proposition that there a coemployee, in performing the negligent act, was performing his employer's nondelegable duty to use reasonable care to furnish the coemployee (plaintiff there) a reasonably safe place in which to work. And it is also true that the cases cited in support of the test stated in that case and quoted above to determine whether there exists a fellow servant relationship within the scope of the fellow servant doctrine, were generally cases in which it was held that employees of the same employer were not fellow servants within the scope of the fellow servant doctrine when they were employed in separate and distinct departments and the work of one department was not closely related to the work of the other, e. g., a railroad engineer and a track worker employed by the same railroad. Nevertheless, the test stated and applied in the Propulonris case, supra, is and should be applicable here and precludes the application of the fellow servant rule to the facts of this case.

Defendant suggests that if plaintiff was not Banning's employee and servant, he was a volunteer and employer's only duty was not to wilfully and wantonly injure him. While we have assumed that plaintiff was Banning's employee and servant, as defendant has insisted, and thus it is unnecessary to notice this alternative contention, nevertheless we note that under the evidence in this case plaintiff could not have been a volunteer because Jackson, as Banning's dock foreman, admittedly had the authority to request plaintiff to assist in the work of moving the boats and dock. 56 C.J.S. Master and Servant § 177, p. 864.

Defendant contends that plaintiff was contributorily negligent as a matter of law. He cites no authority but his argument in support runs thus: that plaintiff "knowingly and willingly occupied a position of danger on the boat dock and knew or should have known that in occupying such position he would likely lose his balance and fall if such boat dock collided with any object in the channel." Defendant suggests that the unfinished portion of the dock which plaintiff occupied was obviously an unsafe place to stand, particularly when he had to handle an oar; that there were no lights in the channel; that the current was five miles per hour; that despite the fact that he saw the drum in time to shout a warning, he did not brace himself sufficiently to avoid falling.

We find nothing in the evidence to indicate that the left front portion of the dock was a more dangerous place than any other portion of the dock. True, it was not completely covered with planking, but there was a plank upon which plaintiff's right foot rested and it would appear that his position was as secure with his left foot braced against a joist as it would have been had he been standing on a smooth plank surface. Plaintiff had made several safe trips through the channel on dock sections that same night and no partially submerged "leaker" drum or other obstacle had been encountered. True, there were no lights

and it was after dark, yet there was some visibility as is attested by the fact that plaintiff saw the drum in question when it was some six feet from him and approximately four feet from the front of the raft. If the water was traveling through the channel at five miles per hour (there was evidence that the speed of the water was five to ten miles per hour), it is apparent that by the time plaintiff reacted to the fact that he had seen a partially submerged drum the collision would have happened so quickly thereafter that plaintiff would not necessarily have had time to have so maneuvered as to have avoided being thrown to the floor of the dock by the force and impact of the collision. Plaintiff was instructed to ride the dock by defendant's foreman with the knowledge of the defendant Banning. Certainly, in view of the prior safe trips, there was nothing apparently involved in transporting the E-shaped dock which we should say must have indicated to plaintiff that taking the E dock through the channel would not be safely accomplished. The question of a plaintiff's negligence is always for a jury "unless it may be said from all the evidence and the reasonable inferences therefrom, viewed in the light most favorable to plaintiff, the only reasonable conclusion is that plaintiff was negligent and that his negligence was a proximate cause of his injury." Kickham v. Carter, Mo., 314 S.W.2d 902, 908[8]. Clearly, the question whether instant plaintiff was negligent was for the jury.

In his opening statement, plaintiff's attorney said that the evidence would show that plaintiff was "35 years of age, married, and has two children." The record then indicates:

"Mr. Gibson: I want to object and move that the statement be stricken and this panel be discharged, because that remark is not proper opening statement. Mr. Cason: Judge, I am just identifying the gentleman. The Court: Overruled."

When plaintiff testified, he was asked his age, whether he was married, and then:

"Q. Do you have children? A. I have two children. Mr. Gibson: I object to the question and answer, move it be stricken from the record and the panel be discharged, Your Honor, as error. The Court: Overruled. Mr. Gibson: Showing the number of the family. Mr. Cason: Let it be shown that the objection came some time after the answer. Mr. Gibson: It was answered too fast."

Defendant contends that the trial court abused its discretion in refusing to discharge the jury because of the remark in the opening statement and committed reversible error in admitting plaintiff's testimony that he had two children.

In Meade v. Kansas City Public Service Co., Mo., 250 S.W.2d 513, 515[3], it was said:

■ "Since the case of Dayharsh v. Hannibal & St. J. R. Co., 103 Mo. 570, 15 S.W. 554, it has been generally said to be improper to inquire of a plaintiff relating to the number of persons comprising his family. State ex rel. Dick & Bros. Quincy Brewery Co. v. Ellison, 287 Mo. 139, 229 S.W. 1059; Holtz v. Daniel Hamm Drayage Co., 357 Mo. 538, 209 S.W.2d 883; Welch v. Thompson, 357 Mo. 703, 210 S.W. 2d 79. This is on the theory that such an inquiry is ordinarily made only for the purpose of appealing to the sympathy of the jury. It has also been held that, since such an inquiry is usually incompetent for any purpose, a general objection is sufficient. State ex rel. Dick & Bros. Quincy Brewery Co. v. Ellison, supra."

It is apparent that the number of children a plaintiff may have is in almost every instance wholly irrelevant to any issue in a damage suit and is erroneously admitted and, except under most unusual circumstances (not here existing), constitutes an improper part of an opening statement.

■ In this case the evidence showed that plaintiff, 35, was married, operated his own insurance agency and was a deputy collector of revenue for the State of Missouri issuing vehicle and drivers' licenses. As noted, the verdict herein was for $8,500 which we have found was in nowise excessive. We are of the view that the disclosure, in the opening statement and in the evidence, that plaintiff had two children was not, under the facts and circumstances of this case, error which affected the merits of this action and thus does not require a reversal of the judgment. Section 512.160(2) RSMo 1949, V.A.M.S. It is inconceivable to us that the fact that the jury knew that this plaintiff had two children affected the instant verdict and the trial court considered the matter on motion for new trial and apparently also concluded that no prejudice to Mr. Banning had resulted.

■ Defendant contends that the trial court erred in giving plaintiff's instruction P-4 for the alleged reasons that it was misleading and gave undue prominence to a single issue. The instruction was: "The Court in giving you these instructions does not intend to assume as true any fact referred to therein since it is your province and yours alone to decide the issues of fact and the amount of damages, if any, to which under the rules of law, the Plaintiff is entitled."

Defendant concedes that the instruction, in so far as it tells the jury that the court does not mean to assume as true any fact mentioned in the instructions and that the jury is to determine the fact issues, has been approved by this court. See Greenwood v. Wiseman, Mo., 305 S.W.2d 474, 476[1]. Defendant's complaint is confined to the addition which told the jury that its function was to decide the amount of damages, if any, to which, under the rules of law, plaintiff was entitled. Defendant says that when that additional direction is considered, the instruction as a whole singles out and makes unduly prominent the damage issue and is misleading in that its effect is to tell the jury that respondent is entitled to a verdict and the jury's only function is to decide the amount of damages. We can-

not agree that the instruction is reasonably subject to the construction defendant gives it.

Instruction P-2, plaintiff's damage instruction, made the jury's authority to assess *any* damages dependent upon a prior finding for plaintiff on the liability issue and authorized as the only damages a sum which would fairly and reasonably compensate for plaintiff's injuries. When instruction P-4 is read with the damage instruction, it seems unreasonable to conclude that a jury would believe that by virtue of instruction P-4 it was to assess *any* damages unless it had found for plaintiff on the liability issue and unless it had found that plaintiff sustained some damage under the directions contained in the damage instruction. We find nothing in the instruction under attack which would lead a jury to believe that by virtue of it plaintiff was *entitled* to a verdict.

It is true, however, that the instruction wholly unnecessarily dealt with the question of damages. As we read it, it told the jury that if plaintiff was entitled to any damages "under the rules of law," then the jury had the exclusive province of determining the amount of those damages "under the rules of law." Aside from the fact that any direction on the subject had no place in the instant instruction and that its only proper place was as part of a damage instruction, there was the unfortunate use of the expression "under the rules of law" rather than "under the instructions of the court." Inasmuch, however, as it would appear that the only "rules of law" which the jury would recognize or consider in connection with its determination of this case was the "law" as contained in the court's instructions, we are of the opinion that the jury was not misled and that defendant was not prejudiced by the language in the instruction.

Mr. Banning's final contention is that the verdict and judgment are excessive. As heretofore noted, plaintiff, who was 35, testified that he fell with his neck across a timber and his left leg hooked over another. He said that he then went home, changed clothes, returned to look for his glasses, but, inasmuch as others were still moving dock sections, he assisted in moving one more. During supper, which he and the others ate about midnight, he had pain in the left side of his back and a numb feeling in the right half of his head. He also noticed that there were abrasions and contusions at various places on his body. The next morning he saw a doctor who bound his left knee with an elastic bandage and dressed the abrasions. The following morning he saw his regular doctor, an osteopathic physician, who, then and at frequent intervals thereafter, treated him by means of diathermy and gentle massage. He entered a hospital for two weeks in August 1957, where twice each day for an hour he had deep heat therapy and electric vibrator treatment for his back. He was referred to an M. D. in Warsaw who, in September 1957, recommended traction for his neck. As a result, plaintiff installed a traction appliance in his home for the purpose of stretching his neck. He used the appliance once each day for two hours until the latter part of April 1958, and since has used it twice a week for periods of one-half to two hours. The use of the traction had eased the pain in his head and neck and, as a result, he had been able to work longer hours. He said that if he turned his neck to either side and held it there for any length of time, there was an increase in neck pain; that even though the traction had eased the pain in his head and neck, there remained continuous pain there as well as in his low back when it was necessary to be on his feet. He also said there was limitation of motion in his neck and that he had back pain on forward bending.

Plaintiff said further that he operated an insurance agency and was a deputy revenue collector for the state, issuing vehicle and drivers' licenses; that prior to the accident he had been in good health

and had handled both businesses, but that since the accident the license work was handled almost exclusively by his wife; that his sale of new insurance policies had decreased from an average of 27.7 per month to 15.2 per month since the accident due to his physical inability to spend the time he formerly devoted to his business, which had caused a loss of income to him of $125 per month. He had lost 15 pounds in weight which he had not regained by trial time. The total of plaintiff's expenditures to trial time by reason of the accident was $1,044.

Doctor McBee, an osteopathic physician and surgeon, testified that he saw and examined plaintiff on June 2, 1956, at which time plaintiff complained of pain in his neck, low back, knee, and left hip. A physical examination showed multiple bruises and abrasions on the knee, a bruise on the right shoulder, stiffness in the neck, and limitation of motion in the upper cervical region. At that time he also suspected a sacroiliac lesion in the left hip and found limitation of motion in the left leg and hip, and muscle spasm in the back and neck. He prescribed diathermy and massage, pain medicine, and, later, vitamin tablets because of a loss of weight. He had continued to see and treat plaintiff from the first examination to the time of trial, and while the visits were more frequent earlier than at trial time, he estimated that he had seen plaintiff an average of twice a week during the entire period. An examination the day before trial showed that plaintiff had an early arthritic condition in the first, second, and third cervical vertebrae on the right, limitation of motion in the left leg which produced pain on normal motion, and pain and rigidity in the right lumbar region of the back. He referred plaintiff to another physician because he was doubtful that the diathermy and massage treatment he was administering was producing other than temporary relief.

Doctor Rhodes, an M. D., saw plaintiff on March 1, 1957, at which time plaintiff complained of neck pain, headache, aggravated on turning the head, numbness and pain in the low back area, and numbness in the left leg. The doctor found muscle spasm in the neck, tender places in the right posterior area of the neck and muscle spasm in the lumbar area, more marked on the left, which extended to the hip muscles. X rays showed a splinting in the neck due to muscle spasm, i. e., the neck did not bend as readily as it should have, and that there was present a condition known as hypermobility which describes a condition when one vertebra slides abnormally on another with resultant irritation and muscle spasm and which puts an abnormal strain on the nerve roots which, in turn, sets up further muscle spasm and pain. The doctor was of the opinion that the neck traction had helped but that plaintiff still had disability in the neck; that the low back injury was a ligamentous one at the place of the attachment of muscles in the lower sacral area. He had prescribed cortisone derivatives for pain and recommended that plaintiff continue the neck traction and continue to receive the therapy and massage treatment from the other doctor. Dr. Rhodes was of the opinion that plaintiff's neck and back injuries were permanent.

■ Appellant cites no case to support his contention that the verdict is excessive. We think a recitation of the above evidence, considered from the standpoint most favorable to plaintiff, shows on its face that we should not hold this verdict excessive. We cannot agree with defendant's contention that Dr. Rhodes' testimony that the disability on account of plaintiff's injuries was permanent was so uncertain as to be of no force or effect, nor with his contention that plaintiff's estimate of his loss of income was entirely speculative. In addition, however, the damage instruction did not itemize matters to be considered in determining damages but authorized as damages only such sum as the jury found would fairly and reasonably compensate for plaintiff's injuries. Our con-

clusion that the verdict is not excessive is supported by Baker v. Kansas City Terminal Ry. Co., Mo., 250 S.W.2d 999, and Davis v. Ball, Mo.App., 271 S.W.2d 605.

The judgment is affirmed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.