### AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Appellant-Respondent,

v.

### Ricky L. BROWN, Appellant-Respondent,

and

### Linda (Dittmer) Brown, Michael R. Quimby and Leo Endel, Defendants-Respondents.

### No. WD 33381.

Missouri Court of Appeals, Western District.

March 23, 1982.

Edgar S. Carroll, Warrensburg, for American Family Mut. Ins. Co.

J. Kirk Rahm, Warrensburg, for Ricky L. Brown and Linda (Dittmer) Brown.

Stephen W. Angle, Inc., Warrensburg, for respondents, Michael R. Quimby and Leo Endel.

Before CLARK, P. J., and PRITCHARD and WASSERSTROM, JJ.

PRITCHARD, Judge.

This case, as originally appealed under docket number 32,124, was dismissed because there was no judgment on a claim of respondents Ricky L. Brown and Linda (Dittmer) Brown for attorney's fees in defending American Family's claim that no coverage was extended to Ricky under his policy of insurance. Judgment has subsequently been entered against Ricky and Linda on their claim for attorney's fees, and the entire case has been again appealed under the captioned number WD 33381.

The first issue confronting the trial court was whether American Family Insurance Company, which issued its automobile liability policy to Ricky L. Brown, as named insured, covered his liability for his use of a non-owned automobile. Ricky, while driving Linda's 1976 Gran Prix, became involved in a collision with another vehicle in which defendants, Michael R. Quimby, Leo Endel and Nancy C. Quimby, deceased, were occupants. The resolution of this issue turns upon whether Ricky was at the time a resident of the same household of Linda (Dittmer) Brown, with whom he was residing in a mobile home owned by her, but to whom he was not married at the time of the casualty, under this clause of Ricky's policy: " 'non-owned automobile' means an automobile not owned by a named insured or any resident of the same household. * * *." (A similar exclusion also applies to the use of a temporary substitute automobile.) After hearing, the trial court found that Ricky and Linda were not residents of the same household, and thus American Family may be required to defend against the claims against Ricky and may be liable for excess coverage above that of a policy issued to Linda which extended coverage to Ricky as a permitted driver of her car.

The facts before the trial court were these: American Family issued its policy to Ricky for an initial six month period, beginning on March 5, 1979, and ending on September 5, 1979, containing the above non-owned automobile definition clause. The collision in which Quimby and Endel were injured, and in which Nancy C. Quimby died, occurred on July 11, 1979.

Linda (Dittmer) Brown testified that she and Ricky were married on October 6, 1979. The matter of marriage had not been discussed between them at all until about a month before it took place, when the decision to marry was reached. The two had known each other for about 10 years, and had started dating in 1976, at which time and in 1977, Linda was living in a farm home with her mother on Rural Route 3, Concordia, Missouri. Ricky, during those two years, rented a residence three miles south of Sweet Springs, Missouri, from Robin Deke. Linda, although occasionally staying overnight, did not reside there. Ricky lived in the Deke house seven days a week. In September, 1977, Linda purchased a mobile home and had it moved onto her mother's farm, which was rented from the mother's brother-in-law. Linda purchased a homeowner's policy on the mobile home, which sat vacant for two or three months until Linda could have concrete runners poured for it, and she moved into it in December, 1977. The mobile home had a separate LP gas source from her mother's home; the electricity, coming from the same pole, was paid for by her mother; but the cost of water was split

between the two of them. The telephone was separate and was listed in Linda's name. Ricky started staying in the mobile home on December 25, 1977, and made and received telephone calls on Linda's individually listed telephone. Although he had his own furniture from the Deke residence, he did not move it into the mobile home but stored it elsewhere. At that time the two did not have any plans to marry, the situation was not then intended to be permanent, and Linda testified further that the subject of marriage was not brought up until about a month before the marriage, which was October 6, 1979.

After Ricky moved into Linda's mobile home his mail was delivered to the farm mailbox. He kept up the maintenance on the mobile home and paid one-half of the gas and phone bills. Each of the two kept up the expenses on their separately owned automobiles. The cost of groceries was split, the two shared cooking and dishwashing chores, and they entertained mutual friends in the home. Ricky kept his clothing in the mobile home but in a separate room from the bedroom. They shared the same bed in the one bedroom. No household items were then purchased by the pair—the household goods were owned by Linda. Each had separate checking accounts, and neither purchased clothing for the other.

At the time of the collision, Linda owned a 1976 Pontiac Gran Prix and Ricky owned a 1972 Chevrolet van which was then inoperative. Linda gave him permission to drive the Gran Prix which was involved in the collision. Each paid for the gasoline, insurance and maintenance on their separate vehicles, and when Ricky borrowed hers, he put gasoline in it. Before the marriage, Ricky came and went as he wanted to, staying out at all hours, but afterward, he asked Linda if it was all right if he went out.

These further changes occurred after the couple married: The telephone listing was changed to Ricky's name. Their clothing was combined in the same bedroom closet. Ricky offered some of his furniture for sale after the marriage, and then brought some of it into the mobile home, replacing some of Linda's which was not in good shape. All clothing and other expenses were paid from joint checking account created after the marriage, and Ricky took more responsibility for helping in the household duties and chores.

Linda testified further: "Q I am referring to the period now up to the accident of July 11th. A Yes. Q Did you consider you and Rick's staying in the house, living together in the house, to be a permanent or temporary situation? A Temporary."

Two days after the collision, July 13, 1979, a claims adjuster for Linda's insurer, State Farm Mutual Insurance Company (which extended coverage to Ricky by reason of his use of Linda's car by her permission), Barry Gray, took taped telephone conversations from the two of them relative to the incident. American Family subpoenaed William K. Ramsey as a witness, to whom there was issued a subpoena duces tecum, requiring him to bring to court a typewritten copy of the statements of Linda and Ricky from State Farm's records. Ramsey testified that at the time the statements were obtained, State Farm was acting on behalf of both Linda and Ricky. At the instant trial, American Family sought to introduce the statements of Linda and Ricky into evidence, and their counsel objected on the ground of work product and attorney-client privilege, and the admissions of the statements were denied over American Family's offer of proof.

On cross-examination, Linda testified that she recalled giving a recorded statement to Barry Gray on or about July 13, 1979. Linda's recorded telephone statement in part contains this: "Q Okay, now Rick Brown, could you identify him for us? A He is my boyfriend ah, he lives—we've lived together for about a year and a half now and ah, *we're going to be married pretty soon.* Q Okay, now you live together in ah—A In a trailer. Q Okay, at Route 3, Concordia, Missouri? A Yes, un huh." [Italics added.]

■ The trial court erred in excluding Linda's extra judicial statement because it bore upon the credibility of her trial testimony. The statement that she and Ricky were going to be married pretty soon, given near the time of the accident, contradicted her trial version that the arrangement was then temporary, and the subject of marriage was not discussed between them until about a month before the marriage. The temporary or permanent nature of the relationship was a crucial issue in the case, as a matter of *intention* of the parties, the evidence of which is to be taken with all the other facts and circumstances in the case by the trier of the fact. See *Dairyland Insurance Company v. Beekman*, 118 Ariz. 294, 576 P.2d 153 (Ariz.App.1978); *Van Overbeke v. State Farm Mut. Auto Ins. Co.*, 303 Minn. 387, 227 N.W.2d 807 (1975); and the testimony as to the temporary living arrangements in *Giokaris v. Kincaid*, 331 S.W.2d 633 (Mo.1960).

■ The extra judicial statement by Linda was not properly excludable from evidence either as an attorney-client privilege or as work product. *State ex rel. Cain v. Barker*, 540 S.W.2d 50 (Mo. banc 1976), does not apply because the statement given by Linda was not to be used as a defense to a claim made against her personally under her own policy with State Farm Mutual Insurance Company, and thus no privilege arises. See *Truck Insurance Exchange v. Hunt*, 590 S.W.2d 425, 432[7] (Mo.App.1979), distinguishing the *Cain* case and holding that statements made as to insurance coverage were not privileged because they did not concern an event which might have been the basis of a claim against him covered by the policy, and was not intended for the information or assistance of an attorney in defending him. An objection of a prior inconsistent statement to evidence, on the ground of work product, will not lie where it is sought to be used by an adversary for impeachment purposes at trial, and not merely for discovery purposes. See the extensive discussion of this subject in *Halford v. Yandell*, 558 S.W.2d 400, 404[1], et seq. (Mo.App.1977).

The matter of credibility of a witness is one within the exclusive province of the trier of the fact, here the trial court. *Sebree v. Rosen*, 349 S.W.2d 865, 872[4, 5] (Mo.1961), modified, 374 S.W.2d 132 (Mo. 1964). Due regard and deference must be given to the trier of the fact to judge the credibility of witnesses, *Johnson v. Mercantile Trust Company National Ass'n*, 510 S.W.2d 33, 38[1] (Mo.1974), but the trouble here is that the trial court, in excluding Linda's prior contradictory or inconsistent statement, did not consider it, and her credibility with respect thereto remains in limbo. Although there are statements in the cases that an appeal in a case tried without a jury, the appellate court may consider evidence rejected by the trial court if it is admissible and preserved, *Brewer v. Blanton*, 555 S.W.2d 381 (Mo.App.1977); *Edgmond v. Brixey*, 450 S.W.2d 166 (Mo.1970), that rule does not apply because rejected evidence goes to the proof of the merits of a case or a defense on the merits, and not to a matter involving the special province of a trial court, here the credibility of a witness. Linda's statement should have been admitted for impeachment purposes, but on the issue of her credibility, there is no basis for this court to determine what the judgment of the trial court should be. See, in contract, *Thau-Nolda, Inc. v. Krause Dental Sup. & Gold Co., Inc.*, 518 S.W.2d 5, 8[1] (Mo.1974). Here, the judgment must be reversed with directions that the trial court admit Linda's prior recorded statement, and for further hearing of testimony from her with respect to her giving of the statement, and her explanation, if any [see *Rotundo v. Fischlowitz*, 428 S.W.2d 581 (Mo.1968); and *Aboussie v. McBroom*, 421 S.W.2d 805 (Mo. App.1967)], of the statement that she and Ricky soon planned to marry. In reconsidering its decision, the trial court may of course use all of the testimony received at its prior hearing which is now reduced to a transcript of that record, or further evidence if offered.

■ One issue may be finally determined at this time. By their cross-appeal, Ricky and Linda contend that the trial court's

denial of their request for attorney fees incurred in their defense of this declaratory judgment action was in error. American Family concedes that costs awarded under § 527.100, RSMo 1978, and Rule 87.09 may include attorney fees, but says it was not acting in bad faith, and its position is not so clearly wrong that it should be required to pay attorney fees for Ricky and Linda. Although it is not assured that the trial court will reach the same result as to policy coverage after further proceedings, in its position, American Family is correct. See *Preferred Risk Mutual Insurance Company v. Main*, 295 F.Supp. 207, 219 (W.D.Mo.1968), holding that no award of attorney fees would be allowed where there were unresolved issues of fact and law which justified the bringing of the action, in good faith, to determine plaintiff's obligations.

The judgment denying Ricky's and Linda's claim for attorney fees is affirmed. The judgment otherwise is reversed and the case is remanded for further proceedings.

All concur.