John CARTHEN, Jr.,
Plaintiff-Respondent,

v.

The JEWISH HOSPITAL OF ST. LOUIS,
Marshall Poger, MD. and Joseph Lombardo, MD., Defendants-Appellants.

No. 48211.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 4, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 12, 1985.

Application to Transfer Denied
Sept. 10, 1985.

David C. Drury, St. Louis, for plaintiff-respondent.

Parks G. Carpenter, M. Jane Schweitzer, Dana D. Eilers, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Keaney, St. Louis, for defendants-appellants.

FRED E. SCHOENLAUB, Special Judge.

This action for damages arises out of an incorrect diagnosis of invasive adenocarcinoma by appellants, Marshall Poger, MD., and Joseph Lombardo, MD., pathologists and employees of appellant, The Jewish Hospital of St. Louis (hereinafter defendants), based on microscopic examination of esophageal biopsy specimens taken from

respondent (hereinafter plaintiff) on December 5, 1979, at Jewish Hospital. A jury trial resulted in a verdict in favor of plaintiff in the sum of $2,500,000 upon which the court entered judgment. The judgment is affirmed.

On Thanksgiving Day 1979 plaintiff, John Carthen, Jr., experienced some difficulty in swallowing and a burning sensation in his chest. He went to Christian Hospital Northeast in St. Louis, where upper GI X-rays revealed an hiatus hernia with esophageal reflux. In early December 1979 his personal physician, Dr. Michael Orgell, referred him to Dr. Burton Shatz, a physician specializing in gastroenterology. On December 5, 1979, at Jewish Hospital, Dr. Shatz performed an endoscopy, which involved the passing of a flexible tube with a light and lens on it through plaintiff's mouth in order to permit a visual examination of the interior of his esophagus and stomach. In this examination Dr. Shatz observed inflammation of the lower part of the esophagus just above the point where it enters the stomach, some ulceration and a stricture, or narrowing, of the opening into the stomach. Dr. Shatz testified that this type stricture is usually caused by scar tissue and had probably developed over a period of several months. No tumors were seen by Dr. Shatz. The stricture was benign appearing and there was no area suspected of being malignant. Dr. Shatz then took biopsies of the esophagus, a standard practice when there is an inflammation and stricture. In taking the biopsy, a forceps was passed through the endoscope and pieces of tissue were pinched off in the area of inflammation, ulceration and stricture. These pieces of tissue were then sent to the pathology department at Jewish Hospital where they were processed and prepared for microscopic examination.

Dr. Lombardo made a diagnosis of invasive carcinoma or cancer. As a resident physician, he showed the slides to the senior pathologist, Dr. Marshall Poger. This review was routine, particularly when the diagnosis was cancer. Dr. Poger reviewed the slides and diagnosed poorly differentiated adenocarcinoma. He testified that the biopsy had nests of highly atypical gland forming cells which had invaded the underlying connective tissue, and that those cells, when they have so invaded, are invasive adenocarcinoma. Because plaintiff was somewhat younger than the majority of people with esophageal cancer, Dr. Poger showed the slides to a number of pathologists on the staff including Dr. Meyer, Dr. Gustave Davis and Dr. Robert McDivitt, the chairman of the department. Dr. Davis reviewed the slides and diagnosed adenocarcinoma of the esophagus. Dr. McDivitt was not as certain of the diagnosis as the others, but by the time the report went out to Dr. Shatz he was in agreement.

Dr. Richard Shaw was consulted to do the anticipated surgery. Dr. Orgell, Dr. Shatz and Dr. Shaw all went to the pathology department to review the slides and discuss the case. Dr. Shatz, who had training in pathology, diagnosed cancer and testified that he would not rely on what he personally diagnosed, but would defer to the judgment of the pathologists. Dr. Shaw also reviewed the slides and agreed with the diagnosis of cancer, although as a surgeon he would not rely on his own ability to diagnose cancer from the slides. Numerous other tests were performed to determine whether the cancer had spread outside the confines of the planned operation. They were negative, indicating a greater chance of a successful operation.

Plaintiff was advised by Dr. Shaw of the nature and extent of the surgical procedure intended, which involved opening the chest in the area of the ribs and performance of an esophagogastrectomy, removing the lower part of the esophagus and upper part of the stomach and tying the remaining ends together, a procedure which can result in long-term complications including incisional pain, nausea, belching, bloated feelings after eating, vomiting, diarrhea, and loss of weight.

In the operation on December 26, 1979, the distal part of plaintiff's esophagus and the proximal portion of his stomach were

removed, along with a rib and some fatty tissue. The resected specimen was sent to the Jewish Hospital pathology department. Nineteen slides were made from representative samples of this tissue. No cancer was found in any of the slides.

When the lower esophagus and upper stomach were removed, nerves which control the muscular activity of the stomach and the ability of the stomach to produce acid were cut. The remaining stomach no longer has a propulsive activity. At the same time as the esophagogastrectomy, a pyloroplasty was performed in order to enlarge the opening from the stomach into the intestine, thereby allowing the stomach to empty better.

After plaintiff's first operation he was refluxing bile and pancreatic juices. On June 9, 1980, an antrectomy was performed at Jewish Hospital wherein the lower one-third of his stomach was removed. A Roux-en-Y operation was also performed in an attempt to stop the reflux. A valve mechanism was created and the intestines were rearranged in an attempt to divert the bile and pancreatic juices farther "downstream" so there would be less likelihood of regurgitation into the stomach and esophagus.

■ Defendants first allege error by the trial court in failing to grant their Motion for Judgment Notwithstanding the Verdict or for New Trial because of the trial court's error in the admission of testimony by plaintiff's witnesses Doctors Michael J. Lotz and Irwin A. Oppenheim. They contend they were deprived of their discovery rights prior to trial regarding the opinions of the doctors and the bases therefor because of the refusal of plaintiff's attorney to permit, and the court to order, use during the depositions of reports the doctors had made to plaintiff's attorney. Defendants contend the doctors testified that their own recollections were faulty, and that revival of their memories was sought by reference to the reports. They further contend that because the doctors' memories were faulty, defendants should have been given access to the reports for their review and inspection before being utilized by the doctors for refreshment of their recollection. Defendants also contend their inability to see the reports resulted in their being prejudicially surprised at trial.

Plaintiff contends the doctors' reports were "work product" and not subject to discovery, and that had defendants desired only to refresh the doctors' memories, use of the biopsy slides would have served that purpose. A considerable portion of the depositions of Drs. Lotz and Oppenheim, 36 of 89 pages, concerned defendants' right to the reports and whether the reports or the slides, which the doctors had originally examined, would be used to refresh their recollection. Both the reports and the slides were available but not used during the depositions.

In his deposition Dr. Oppenheim did state that he could not remember if some of the slides were stained differently from the others, whether more than one stain was used in preparation of the slides, and whether all four slides showed focal ulceration with discontinuance of ordinary tissue. Use of the slides would have refreshed his memory on these points. He also testified, however, that he saw no evidence of what Dr. Poger had reported as "poorly differentiated adenocarcinoma," but that he did see tissue from the esophagus which showed evidence of inflammation and some atypia which you see in inflammatory conditions in that area, and that he saw an esophageal biopsy consistent with focal ulceration and chronic esophagitis, that focal ulceration is a distinction of normal tissue, "a cratered sort of an affair." He further testified that the physician making the report "deviated substantially from the customary practice." He also testified that he had no doubt that there was no cancer on the slides he examined, but that the slides of the biopsy of December 5 were consistent with focal ulceration, chronic esophagitis, severe dysplasia, and that dysplasia is "atypia" and can be seen as a result of inflammation, or it can be seen in the development in malignant neoplasms.

In the deposition of Dr. Lotz defendants' counsel asked, "As you sit here right now, can you remember the details of each of the 30 slides that you examined in this case, each of them?" The doctor's answer was, "No." The only question asked the doctor concerning his examination of the slides and the pathology report was, "Did you see any cancer on any of the slides that you looked at?" The doctor responded, "No."

Having made no attempt in the deposition to test Dr. Lotz' recollection of his examination of the slides and pathology reports, or to determine the matters about which he would testify at trial, defendants cannot now complain that they were taken by surprise at trial and were, therefore, unable to effectively cross-examine the doctor.

Missouri courts have long held opinions of a party's expert witnesses, and writings obtained or prepared by the representatives of a litigant for the use at trial, or which express the conclusions of a party's expert, to be work product and not subject to discovery. *State ex rel. State Highway Commission v. Dalton*, 498 S.W.2d 801, 802 (Mo. banc 1973); *State ex rel. State Highway Commission v. Kalivas*, 484 S.W.2d 292, 293 (Mo.1972); *State ex rel. Missouri Public Service Company v. Elliott*, 434 S.W.2d 532, 536 (Mo. banc 1968) (except examining physicians' reports under Rule 60.01); *State ex rel. State Highway Commission v. Jensen*, 362 S.W.2d 568, 570 (Mo. banc 1962); *State ex rel. Highway Commission v. Crain*, 496 S.W.2d 867, 870 (Mo.App.1973). Rule 56.01 did not change the status of such opinions as work product, but provided a method whereby, under some circumstances, they would be subject to discovery.

With the adoption of Rule 56 parties became entitled to discover on deposition the facts, opinions and conclusions to which an expert is expected to testify at trial, Rule 56.01(b)(4)(b); *State ex rel. State Highway Commission v. Pfitzinger*, 569 S.W.2d 335, 336 (Mo.App.1978), and upon a showing of substantial need and an inability to obtain the substantial equivalent without undue hardship, documents and tangible things otherwise discoverable under subdivision (b)(1). Rule 56.01(b)(3); *Porter v. Gottschall, etc.*, 615 S.W.2d 63, 65 (Mo. banc 1981); *State ex rel. State Farm Mut. Auto. v. Keet*, 601 S.W.2d 669, 672 (Mo. App.1980).

In *Halford v. Yandell*, 558 S.W.2d 400, 409 (Mo.App.1977), it was held that Rule 56.01(b)(3) "gives an absolute immunity against disclosure of certain matters (the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation)." The rule also gives a qualified protection against discovery of documents prepared in anticipation of litigation or for trial by or for another party or his representative, discoverable only upon a showing of "substantial need" and "undue hardship."

In *State ex rel. State Farm Mut. Auto. v. Keet*, supra, l.c. 671, after a Notice to Take Depositions was served, a subpoena duces tecum was served requiring production at the deposition of certain materials some of which were trial preparation materials. No showing had been made of need for the materials under Rule 56.01(b)(3). In their brief on behalf of the respondent judge plaintiff stated "that no effort will be made to inspect or review any item, documentary or otherwise, as to which the objection of privilege, trial preparation material, or work product is made." The court held that such materials were not discoverable by a request for production under Rule 58.01, that a party should not be able to obtain by subpoena duces tecum a broader range of materials than it might have obtained by production of documents under that rule, and that until the required showing for the production of trial preparation materials is made under Rule 56.01(b)(3), such materials cannot be subpoenaed for production at a deposition. The court further noted that upon their use at the deposition which plaintiff was seeking to compel a party might ordinarily examine

them and thus receive information beyond the scope of the discovery rules.

In this case defendants' declared purpose in using the reports to refresh the recollections of the doctors was to examine the reports without making the required showing under Rule 56.01(b)(3) of substantial need and inability to obtain the substantial equivalent without undue hardship. If, as defendants allege, they were "surprised" at trial by the testimony of Drs. Oppenheim and Lotz, and that when the facts supporting the doctors' opinions were disclosed at trial "defense counsel was hearing them for the first time," it was not because defendants had been "deprived of their discovery rights," but rather because counsel lost sight of his reasons for taking the depositions. Instead of asking questions which would reveal what the doctors' testimony would be at trial, his efforts were directed mainly at obtaining copies of the reports the doctors had made to plaintiff's counsel. For this defendants cannot now condemn plaintiff's counsel or the trial court.

Defendants also cite *Halford v. Yandell,* supra, as authority for the proposition that a written statement should be produced if a witness testifies at trial, and that, at "the very latest, when counsel made his pretrial Motion in Limine, the reports should have been produced." In *Halford v. Yandell,* it was held that, having elicited at trial certain testimony from a nonparty witness, an objection could not *then* be interposed, based on the work product doctrine, to production and use of a prior inconsistent statement. Citing *State v. Scott,* 407 S.W.2d 79 (Mo.App.1966), it was further held that a litigant has a right to require the production at trial of "such documents as in his judgment are required by him to meet the issues raised in the action," and that it is a duty of the clerk to issue a subpoena duces tecum for the production of documentary evidence *at trial* unless, as limited by Section 491.100 RSMo, it is unreasonable and oppressive. In *American Family Mut. Ins. Co. v. Brown,* 631 S.W.2d 375, 377 (Mo.App.1982), it was also held that an extra judicial statement by a

witness was not properly excludable from evidence as work product, the court holding that such objection will not lie where the statement is sought to be used by an adversary for impeachment purposes *at trial,* and not merely for discovery purposes. Here, however, a motion by defendants to compel production of the reports and order further depositions of the doctors, or in the alternative, to preclude their testimony at trial was overruled on August 22, 1983. The trial started on October 24, 1983. On that date defendants presented a "verbal Motion in Limine," seeking only "to bar these witnesses from testifying in this case, because we have been deprived of our right of discovery." The motion was overruled. The defendants did not at that time or at any other time during trial, before or after the doctors were called as witnesses, request copies of the reports. Subpoenas duces tecum were issued, and quashed for production of the reports for use during discovery, but no request for issuance of such subpoenas was made at trial. The trial court did not err in overruling defendants motion to exclude the testimony of Drs. Oppenheim and Lotz, or in overruling their Motions for Judgment Notwithstanding the Verdict or for New Trial for this reason.

■ Defendants next contend that the trial court erred in failing to grant their Motions for Judgment Notwithstanding the Verdict, or for New Trial, alleging that the opinion testimony of Drs. Lotz and Oppenheim was unsupported by the facts relied upon by the witnesses and was conflicting, inconsistent, unworthy of belief, and as a matter of law, insufficient to state a justiciable cause. Defendants carry an onerous burden in their attempt to overturn the jury verdict. *Jarrell v. Fort Worth Steel and Mfg. Co.,* 666 S.W.2d 828, 833 (Mo.App.1984), holding a directed verdict to be a drastic action, granted only when no reasonable and honest men could differ on a correct disposition of the case. The court further held that a party is not entitled to a directed verdict unless reasonable minds, viewing the evidence in a light most favor-

able to the other party, could only have found in favor of the moving party.

Dr. Oppenheim testified that the slides showed esophageal biopsy material, that they showed epithelium and some inflammatory cells and areas of ulceration and erosion of the epithelium, and that there was a little thickening. He also testified that the slides contained features that are consistent with reflux esophagitis, that when you have reflux esophagitis you have inflammation, and when you have ulceration, you may have reflux esophagitis. In reference to the pathology report of a stricture, he testified that such could occur with reflux esophagitis. He testified that none of the fragments on the slides showed invasiveness, and that in his opinion defendants did not use the ordinary degree of skill and learning such as other practitioners use in similar circumstances. He further testified that adenocarcinoma arises by definition from glandular tissue and that the reference to "poorly differentiated" used in the pathology report means that defendants could not tell what group it belonged to, whether it belonged to squamous, adeno or any other group.

On cross-examination Dr. Oppenheim testified that plaintiff had ulceration, inflammation, and a stricture in his esophagus, and that there was some moderate, perhaps severe dysplasia or abnormalities in the cells. He testified that the severe dysplasia is found both as a benign condition in inflammation and in malignant neoplasms, which is cancer. He further testified that there were small glandular formations of epithelium, but that they were not glands, and that these glandlike formations were in an area where they did not belong, that they had abnormal tissue in them, but that you see glandular formations abnormally by a process called squamous metaplasia, which occurs with reflux esophagitis and inflammation, but that this is not equivalent to cancer.

Dr. Lotz testified that the first portion of tissue on the first two slides was composed of squamous epithelial cells without any of the underlying tissue, a smaller portion of tissue which had some squamous cells, and then some mucosa with inflammatory cells and glandular cells. He testified that "inflammatory cells" meant "lymphocytes and other cells which react to one another in injury or as a result of some problem in an organ indicating some inflammation." He further testified that the other fragment contained some squamous epithelial cells, some lamina propria, some submucosa, and was largely glands which are different kinds of cells than squamous cells. He further testified that the fragment had a lot of changes in it, suggesting an inflammation had taken place, that there was something going on which had disturbed the normal esophagus, that it was not a normal esophagus, that there were indications of esophagitis, but that there was no evidence of an invasive carcinoma. He further testified that the slides contained features that were consistent with esophagitis, which include the inflammatory cells, that the changes in the squamous epithelium were reactions to something, causing the esophagitis, and that stomach acid and other things might be causing that kind of change.

He further testified that he did not find evidence in the slides to justify a diagnosis of invasive adenocarcinoma, that the slides did not contain adequate evidence for that diagnosis, and that he had no doubt that there was no cancer on the slides. He testified that the report was not substantiated by tissue evidence and further biopsy study should have been recommended, as well as other tests which were available to determine if cancer existed.

On cross-examination he further testified that in some of the slides there are mitoses which have an abnormal appearance, which might come about because of several reasons, but that that does not indicate anything in and of itself. He also testified that in making a diagnosis you look at how regular the chromantin is in the cell and at abnormal mitoses. Here, some of the glands were normal and some of them were not perfectly normal, some of the glands showed some variation between the

nuclei and their position, or in their size, indicating that they were not normal glands, that there were inflammatory cells and lymphocytes and some necrotic cells which were cells where they did not belong. He further testified that there were some changes in the squamous epithelium, referred to by some pathologists as dysplasia, but that he did not see what would properly be called dysplasia among the glandular cells.

He further testified that a person can have mitoses and not have cancer, mitosis meaning that cells are divided, that they may be dividing because they have been injured or as a response to an injury in the area, in which case there may be no cancer whatsoever. Mitoses also occurs when cells are divided because they are a part of a cancer. He further testified that because a cell varies in size or shape from that of another cell it does not necessarily mean that one of the cells is cancerous. He also testified that reflux esophagitis results in unusual looking cells, that if the acid coming out of the stomach does damage to the bottom part of the esophagus there may be regrowth and regeneration of the lining, and that you have, in the course of the regeneration or growing back, some funny looking cells, but that their existence does not prove or disprove the existence of cancer.

Defendants assert that, looking at the testimony of plaintiff's experts as an integrated whole, one sees that they testified to seeing on the slides of the December 5, 1979, biopsies the very characteristics which were diagnostic of cancer as found by the twelve expert medical witnesses offered by defendants. In addition to misinterpreting parts of plaintiff's medical testimony, defendants ignore the fact that the testimony of their experts is considered only as it might give strength to the plaintiff's case. *American Mortg. Inv. Co. v. Hardin-Stockton*, 671 S.W.2d 283, 292 (Mo. App.1984), holding that the question of submissibility is premised upon a review of the evidence in a light most favorable to the plaintiff, giving him the benefit of all reasonable inferences therefrom, and that the

evidence of the defendant must be disregarded except where it supports or aids the evidence of the plaintiff, *Rauschelbach v. Benincasa*, 372 S.W.2d 120 (Mo.1963).

In *Smith v. Allied Supermarkets, Inc.*, 524 S.W.2d 848, 849 (Mo. banc 1975), it was held that, in deciding whether a plaintiff has made a submissible case, the evidence must be viewed in a light most favorable to plaintiff, giving him the benefit of all inferences which may be reasonably drawn from the evidence in support of his cause of action. And in *Levin v. Sears Roebuck and Co.*, 535 S.W.2d 525, 527 (Mo.App. 1976), cited by defendants, it was held that "we must indulge the presumption that the plaintiff's evidence is true, disregard defendant's evidence in conflict therewith and give the plaintiff every reasonable favorable inference to be drawn from all the evidence." The court notes that their rules and criteria do not go so far as to permit a disregard of the dictates of common reason and to accept as correct or true that which obviously under all the circumstances in evidence cannot be correct or true, to supply missing evidence, give plaintiff the benefit of unreasonable, speculative or forced inferences, or consider only isolated parts of plaintiff's case. Giving plaintiff in this case the benefit of the presumption, and finding that plaintiff made a submissible case, does not require a disregard of common reasons, supplying of missing evidence, giving plaintiff the benefit of unreasonable, speculative or forced inferences, or giving consideration to isolated parts of his case.

Defendants further contend, however, that the testimony of Drs. Lotz and Oppenheim was so contradictory, inconsistent, and unsupported by the underlying facts as to be unworthy of belief and insufficient as a matter of law to establish a prima facie case.

In *Pate v. St. Louis Ind. Pack. Co., Div. of Swift and Co.*, 428 S.W.2d 744, 752–753 (Mo.App.1968), this court held that if conflicting and contradictory statements are reasonably explained, or if there are other

facts and circumstances tending to show which story of the witness is true, and if from a fair consideration of all the other facts and circumstances and contradictory or inconsistent testimony of the witness, a jury could reasonably determine what should be accepted as true, then the credibility of that witness and the weight to be given his testimony are questions for the jury. Regardless of how persuasive the testimony of the party may be, the trier of fact is not required to believe even that portion which is uncontradicted and undisputed, and could if it so desired believe claimant's evidence even though it was contradicted and disputed.

The cases cited by defendants are not in point. In *Fisher v. Wilkinson*, 382 S.W.2d 627 (Mo.1964), the plaintiff produced no expert testimony concerning the treatment given plaintiff by defendant. In *Savage v. Christian Hospital Northwest*, 543 F.2d 44 (8th Cir.1976), no expert testimony whatever was presented, and in *Rauschelbach v. Benincasa*, 372 S.W.2d 120 (Mo.1963), the expert witnesses stated that they did not know what caused the injury. In *Kappel v. Slickman*, 401 S.W.2d 451, 453 (Mo. 1966), the court held that the evidence was insufficient to show that the negligence charged against defendant was the cause of plaintiff's injury. In *Odum v. Cejas*, 510 S.W.2d 218, 225 (Mo.App.1974), the court held that the testimony of one of the witnesses, when considered with appropriate regard for the fact that much of it was predicated upon an incomplete and deficient hypothesization of the facts, and that the statements of the witness plainly reflected uncertainty, a submissible case on the essential element of causal connection was not made.

■ Defendants next contend the trial court erred in failing to sustain the objections to, and failing to grant a mistrial because of, "prejudicial testimony and comments by plaintiff's counsel relating to plaintiff's dependent children." During direct examination of plaintiff's economic witness, counsel asked whether, in arriving at his computations, he had assumed certain facts. One such question was, "Did you assume that he had any dependent children?" He replied: "In order to arrive at the tax rate." Defendants objected on the ground that the testimony was "inflammatory, prejudicial, and not admissible as evidence." The objection, motion for mistrial and request that the jury be instructed to disregard were overruled, the court stating: "I think he already answered the question."

In addition to the objection coming too late, *Doherty v. St. Louis Butter Co.*, 339 Mo. 996, 98 S.W.2d 742, 747 (1936), *State v. Cannady*, 660 S.W.2d 33, 37 (Mo.App. 1983), it cannot be held that this one reference to plaintiff's children could have affected the jury's verdict. In *Daniels v. Banning*, 329 S.W.2d 647, 653 (Mo.1959), where mention of two children was made in opening statement and during plaintiff's testimony, it was held that, although inquiry of a plaintiff relating to the number of persons comprising his family was generally held to be improper, under the facts and circumstances of that case, it was not such an error as would have affected the merits of the action, it being inconceivable that the fact that the jury knew that the plaintiff had two children would have affected the jury's verdict.

In *Pyles v. St. Louis Public Service Company*, 372 S.W.2d 114, 117 (Mo.1963), it was held that, although the number of children plaintiff had was not relevant to any issue in the case, and such testimony usually should not be admitted, two separate references to plaintiff's children, even when considered with other improper argument of plaintiff's counsel, did not constitute reversible error. In *Smith v. Wabash Railroad Company*, 338 S.W.2d 16, 21 (Mo.1960), it was held that testimonial declarations concerning family and other matters, even though not innocently or unwittingly given, are not reversibly erroneous unless they "were manifestly inflammatory and deprived the defendant of a fair trial."

In *Bush v. Anderson*, 360 S.W.2d 251, 255 (Mo.App.1962), this court held that such evidence, even though inadmissible,

does not always constitute reversible error where it appears that it has not affected the merits of the action, and in *Larson v. Alton and Southern Railroad Company*, 431 S.W.2d 687, 691 (Mo.App.1968), that the disclosure that plaintiff had one child 13 months old, occurring without any emphasis being placed upon the matter and resulting from plaintiff's voluntary statement, was not an error that affected the verdict and would require reversal.

In this case, the single reference to respondent's children came, without any emphasis being placed on it, during the testimony of an economist explaining factors considered by him in arriving at his conclusions concerning respondent's projected after-tax loss due to his unemployability. It cannot be seriously contended that this one incident in any way affected the outcome of the case.

■ Defendants next contend that the trial court erred in "Permitting the introduction of evidence on the issue of defendants' alleged failure to perform or recommend a second biopsy." Rule 84.04(d), V.A.M.R., requires that the points relied on shall state what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous. Merely stating the nature of an alleged error without also stating "wherein and why" it is erroneous neither complies with the rule nor preserves anything for review. *Thummel v. King*, 570 S.W.2d 679, 685–687 (Mo. banc 1978); *Depper v. Nakada*, 558 S.W.2d 192, 198 (Mo.App. 1977); *Yellow Service Co. v. Human Development Corp.*, 539 S.W.2d 713, 714 (Mo. App.1976); *Thigpen v. Dodd's Truck Lines, Inc.*, 498 S.W.2d 816, 818 (Mo.App. 1973). This point does not comply with the rules. We will, however, consider it, and attempt to determine their complaint from the argument portion of their brief.

■ Their theory appears to be that no proximate cause existed between the subject of a second biopsy and any damage plaintiff sustained, and that the hypothetical question posed concerning such a recommendation was not predicated on the evidence and assumed the existence of facts not in evidence. The issue of negligence in failing to recommend a second biopsy was pleaded but not submitted to the jury. Assuming, without deciding, that the evidence concerning a second biopsy was erroneously admitted, it has long been held that where evidence has been improperly admitted on issues not submitted to the jury for its determination, such admissions, even though erroneous do not constitute reversible error. *Missey v. Kwan*, 595 S.W.2d 460, 463 (Mo.App.1980); *Holtmeyer v. Scherer*, 546 S.W.2d 29, 34 (Mo.App. 1976); *Wissmann v. Pearline*, 235 Mo.App. 314, 135 S.W.2d 1, 6 (1940).

Defendants also allege error by the trial court in "Permitting theatrical appeals to sympathy and prejudices of the jury by plaintiff during voir dire examination and during trial." This point also violates the provisions of Rule 84.04(d), V.A.M.R., by failing to state what rulings of the court are sought to be reviewed and wherein and why they were erroneous. We must again look to the argument portion of defendants' brief, where they have expanded this allegation of error and complain that during the jury voir dire, and in the presence of the jury panel, plaintiff took medication, that at other times during the trial he belched, grimaced, squinted his eyes, wept, and that during his direct examination, volunteered testimony. An examination of the transcript reveals that neither the court nor plaintiff's counsel observed the taking of medication, but the court did caution counsel that plaintiff was not to take medication and that theatrics would not be permitted.

In *Dickerson v. St. Louis Southwestern Ry. Co.*, 674 S.W.2d 165, 171 (Mo.App. 1984), where error was alleged in denying appellant's motion for mistrial "when the jury saw respondent's wife helping him up from a supine position on a courtroom bench," it was noted that the record was devoid of any indication that the jury actually saw the incident of which appellant complained other than the bare statement of appellant's trial counsel. In that case

the court held that whether to grant a mistrial is a matter within the sound discretion of the trial court, citing *Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 485 (Mo.1972), and that the trial court was in a better position than this court to observe the effect which the alleged incident had on the jury, even assuming that it took place. The court further noted that the jury had already been told during testimony that respondent needed to lie down on occasion in order to relieve the pain in his back.

■ As to the belching, grimacing and squinting, as was noted by his counsel and the court, and as was clear from the testimony of the medical witnesses of both parties, such was plaintiff's condition and was not likely to change with a delay or recess in his testimony. Each of the two incidents was of short duration and, from the testimony of the medical witnesses, came about as a direct result of the surgery. The medical testimony also verified the existence of constant pain and other permanent problems, including belching and the use of medications.

■ The weeping and alleged voluntary testimony came during a two to three minute period in response to the question, "I am just asking you in terms of enjoyment of life, has it affected you?" Plaintiff replied, "I can't keep a girlfriend, because I don't ... I can't go out." The statement was clearly in response to a question by counsel. The matter of determining whether the weeping engendered passion and prejudice on the part of the jury is within the discretion of the trial judge. The trial judge did not abuse that discretion.

■ In *Eichelberger v. Barnes Hosp.*, 655 S.W.2d 699, 707 (Mo.App.1983), the plaintiff became emotional and tearful during her testimony and stated that she did not like to be seen in public wearing her oxygen apparatus. A motion for a mistrial was overruled. The court held that, although emotional demonstrations by parties to a personal injury action should be avoided, the prejudicial effect thereof is a matter to be determined by the trial court in the exercise of its sound discretion. Absent a manifest abuse of that discretion, the appellate court should not interfere, citing *Hoene v. Associated Dry Goods Corp.*, supra. In *Walton v. United States Steel Corporation*, 362 S.W.2d 617, 626 (Mo.1962), cited in *Eichelberger v. Barnes Hosp.*, supra, after a doctor had described a painful treatment procedure to which plaintiff must submit the rest of his life, plaintiff stood up in the courtroom and let out a cry and remained standing for a few seconds crying. His wife also was crying. They went out of the courtroom, and when they returned, they were still crying. Later plaintiff was mopping his eyes with a handkerchief and rolling his head down. Motions for mistrial were denied. It was held that an effort should always be made to avoid such demonstrations, but it is well established that their prejudicial effect is a matter to be determined by the trial court in the exercise of its sound discretion. We cannot say he abused his discretion in this instance.

■ Defendants next allege error in permitting prejudicial conduct by plaintiff's counsel during voir dire in attempting to commit the jury to awarding damages for pain, loss of quality of life and specific damages up to $3 million. They complain specifically of the jurors being asked (1) whether they felt a dollar amount could not be awarded for pain and suffering, (2) whether they could put a dollar amount of loss of enjoyment of life, (3) if they could award money for operations and physical condition, and (4) whether they could award the plaintiff $3 million "because of the serious problems resulting from defendant's negligence." No objection was made to the first question, objection to the second was overruled, objections to the last two questions were sustained. Requests for mistrial were denied. The only question objected to, and to which answer was given, concerned whether the jurors could put a dollar amount on loss of enjoyment of life.

In *Shepard v. Harris*, 329 S.W.2d 1, 12 (Mo. banc 1959), on three different occa-

sions the sum requested was mentioned to the jury, the last being whether any member had any conscientious scruples about awarding a certain amount if under the evidence and instructions they felt plaintiffs were entitled to that amount. Objection to the questions were overruled and the questions answered. The court held that, although plaintiffs' counsel might not have been wholly justified in every question asked and statement made, nothing in his conduct even remotely suggested bad faith or any attempt to unduly influence or prejudice the jury and that the trial court did not err in refusing a mistrial or a motion to instruct to disregard. In *Wright v. Chicago Burlington and Quincy Railroad Co.*, 392 S.W.2d 401 (Mo.1965), the court held that the trial court necessarily has discretion in permitting or denying questions upon voir dire examination, and that counsel should be granted wide latitude. In that case, however, the court held that, although counsel had the right to ascertain from the jury panel any bias or prejudice by reason of the amount sued for, or which would render it impossible or difficult for them to render an impartial verdict based upon the evidence and the instructions of the court, the examination could not go so far as to commit or pledge the jury to a certain verdict or amount thereof in advance of hearing all of the evidence. In *Handshy v. Nolte Petroleum Company*, 421 S.W.2d 198, 201 (Mo.1967), it was held to be an established rule in this state that an attorney on voir dire examination may not cause the veniremen to pledge or speculate as to their action in certain contingencies which may later occur during the trial. In that case the jurors were asked whether they "couldn't" return a verdict in the event of certain contingencies. The court held that while it did not approve of the practice of asking veniremen such questions because it does in a sense involve speculation as to the future action of the jurors, they were unable to conclude that any prejudice resulted and that the trial court, therefore, did not abuse its discretion in overruling the objection. The court noted that if the question

had contained the word "wouldn't" it would have been a definite commitment and would likely have been reversible error. "Here the prospective jurors, by their silence, indicated that they *could* render a verdict for defendant if the law and evidence showed that plaintiff was not entitled to recover. But that was not to say that they *would* render such a verdict." (emphasis theirs)

The voir dire questions complained of in this case cannot be viewed as attempts to unduly influence or prejudice the jury, or to commit or pledge the jury to a certain verdict or amount in advance of hearing the evidence. We are unable to conclude that defendants were in any way prejudiced by the questions or that the trial court abused its discretion in denying their requests for a mistrial.

Appellants next assert that a new trial should have been granted because the verdict was excessive, unwarranted by the evidence, and motivated by passion and prejudice generated by trial errors.

In *Fowler v. Park Corp.*, 673 S.W.2d 749, 758 (Mo. banc 1984), it was held,

"The day is passed when this court and the courts of appeals engage in close scrutiny of the amounts awarded by juries for personal injuries. We rely on the trial judge ... We do not disclaim our authority, or that of the courts of appeals, to give attention to the size of verdicts, or to order remittiturs if persuaded that there has been a clear abuse of discretion. There may be cases in which the award is so far out of line, when compared to the tangible damages shown, that the appellate court could be impelled to take corrective action."

Recent courts of appeals cases have held that, in determining whether a verdict is excessive consideration should be given to such factors as the plaintiff's age, the nature and extent of the injuries, medical expenses and other losses, diminished working and earning capacity, changing economic factors, i.e., spiraling inflation, the permanency and degree of injury or disabil-

ity, the amount of pain and suffering, the plaintiff's educational level and the awards in cases involving similar injuries. *Chism v. White Oak Feed Company, Inc.*, 612 S.W.2d 873, 884 (Mo.App.1981); *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 945 (Mo.App.1978); *Ricketts v. Kansas City Stock Yards of Maine*, 537 S.W.2d 613, 619 (Mo.App.1976), holding further that a reduction of the verdict would not be ordered unless it be so grossly excessive that it shocks the conscience of the court and convinces the court that both the jury and the trial court abused their discretion, and that the power to interfere with that judgment will be exercised with caution and only where the verdict is manifestly unjust.

Recent verdicts have included an award of $6 million to a 19-year-old man who suffered the loss of both legs above the knee, had a life expectancy of 50 years, had not used prosthetic devices successfully, will need constant care and medical attention, his employability doubtful, and is incapable of leading a normal social life, *Fowler v. Park Corp.*, 673 S.W.2d 749 (Mo. banc 1984); an award of $1.5 million to a plaintiff who lost his right arm and part of his back at the shoulder, suffers from phantom limb pain, and pain in his right side 24 hours a day, sleeps only every second or third night, his prosthesis is of no use to him other than cosmetically, and he suffers emotional irritability, moodiness and depression, *Jarrell v. Fort Worth Steel and Mfg. Co.*, 666 S.W.2d 828, 839 (Mo.App.1984); an award of $1,747,000 to a 34-year-old plaintiff who could only perform manual labor because of limited education with spinal injuries necessitating two operations, sexual dysfunction, constant pain and depression, and able to resume only light work, *Tennis v. General Motors Corp.*, 625 S.W.2d 218, 231 (Mo.App.1981); and an award of $2,300,000 to a plaintiff where the injury left him a quadriplegic, almost totally paralyzed from the collar bone down, incontinent in both bladder and bowel, sexually dysfunctional, confined in a wheelchair and reliant on assistance to handle almost any activity or function except

eating, his condition permanent, *Chrisler v. Holiday Valley, Inc.*, 580 S.W.2d 309, 312 (Mo.App.1979).

Plaintiff in this case is a 38-year-old male, now totally disabled, with loss of income, and reasonably anticipated future loss of $783,812 plus lost bonuses, overtime and fringe benefits; accumulated medical and related expenses at time of trial of $21,098.91. He suffers from constant belching, difficulty with food staying down, diarrhea, anemia, dizziness, fainting, low blood pressure, constant pain, difficulty swallowing, inability to eat more than small amounts of food very slowly, lost weight, movement restrictions, frequent falling asleep, nausea, bile reflux and loss of appetite. He sleeps on a hospital bed to prevent choking on bile. None of his problems are surgically correctible. He is scarred from his back, around his rib cage and down his chest. He wears a transepidermal nerve stimulator which sends electronic impulses through his skin to aid in masking his chronic pain. A verdict of $2,500,000 cannot be considered excessive.

Defendants finally allege error in the trial court's failure to grant new trial on the basis of after trial discovery of evidence establishing that "the verdict and judgment was obtained through fraud and misstatement of plaintiff as to his earning ability." Defendants' supplemental Motion for New Trial, and the hearing thereon, revealed that plaintiff was still a member of the Army Reserves and had received pay totaling $7,434.07 during the years 1982 and 1983, an average of $3,717.01 per year, which sums included mileage and quarters allowances. Plaintiff's reserve status and income was not developed during discovery or trial.

Defendants complain that, in answer to interrogatories, and in his deposition, plaintiff purposefully suppressed evidence concerning his reserve status. Interrogatory answers alleged to be misstatements concerning plaintiff's employment:

"12. State whether or not you claim to have sustained any loss of income or

wages as a result of the occurrence mentioned in your petition. If so, state:

    a) The amount you are claiming;

    b) The name and address of the employer;

    c) The dates on which you claim to have missed work due to said occurrence;

    d) Complete the attached employer authorization.

ANSWER:

Yes.

a) $2,244.26 per month, plus all items described in answer to Interrogatory 13;

b) Ford Motor Company, 6250 N. Lindbergh, Hazelwood, Mo.;

c) November 1979 to present;

d) See attached.

13. Describe each "fringe benefit" that plaintiff has lost and expects to lose as a result of any act of these defendants.

ANSWER:

When I left Ford I was earning $2,244.26 gross per month, plus fringe benefits of paid vacation for 4 weeks. In addition, there were wage increases, cost of living increases, and overtime, which are as follows:

a) Wage increases—3% for 1980; 3% for 1981;

b) Cost of living increases—1980 of $1,897.40; 1981 of $2,459.60; 1982 every 3 months $1,055.60;

c) Overtime—1981—$2,467.68; 1982—$5,680.32;

In addition there is an advancement increase of 7%."

Deposition answers alleged to be misstatements concerning plaintiff's employment:

"Q. Okay. Are you employed, Mr. Carthen?

A. No, sir.

Q. When have you last been employed?

A. November, 1979.

Q. And what work did you do then?

A. I was a supervisor for Ford Motor Company."

Interrogatory answer alleged to be a misstatement concerning physical examinations which, if answered correctly, would have revealed a military physical:

"14. State the name and address of every person, firm or corporation, other than your attorney and persons mentioned in other answers to interrogatories, to whom you have made any statement or application or given information relating to your physical condition or ability to work, in connection with any application for employment, disability benefits, or pecuniary payments of any nature, since the date of the occurrence mentioned in your petition, including but not limited to, any insurance company.

ANSWER:

Ford Motor Company, 6250 N. Lindbergh, Hazelwood, Mo., and whatever insurance companies it uses for payment of benefits. Also various persons at Social Security whose names and addresses I don't know. I undoubtedly have discussed my condition with my friends and relatives."

The granting of a new trial on the ground of newly discovered evidence rests to a large extent in the discretion of the trial judge. *Koenig v. Skaggs,* 400 S.W.2d 63 (Mo.1966). Such motions are viewed with disfavor and the courts grant them as an exception and refuse them as a rule. *Voss v. Wall,* 562 S.W.2d 147 (Mo. App.1978). They are entertained reluctantly, examined cautiously and construed strictly. *Chapman v. King,* 396 S.W.2d 29 (Mo.App.1965); *Womack v. McCullough,* 358 S.W.2d 66 (Mo.1962).

In *Executive Jet Management, etc. v. Scott,* 629 S.W.2d 598, 610 (Mo.App.1981), it was held:

"It is generally recognized that a party seeking a new trial on the ground of newly discovered evidence must show: (1) The evidence has come to his knowledge since trial, (2) due diligence would not have uncovered the evidence sooner, (3) the new evidence is so material it would probably produce a different result, (4) the new evidence is not cumula-

tive, (5) the affidavit of the witness must be produced or its absence accounted for, and (6) the object of the evidence is not to impeach the character or credit of a witness. *Gehner v. McPherson*, 430 S.W.2d 312 (Mo.App.1968); *Young v. St. Louis Public Service Company*, 326 S.W.2d 107, 111 (Mo.1959)."

██ Defendants have not shown "fraud and misstatement of plaintiff," that "due diligence" would not have uncovered the evidence sooner, or that the evidence is so material that it would produce a different result on retrial. Due diligence would have uncovered evidence of plaintiff's reserve status. Interrogatory and deposition questions asked of plaintiff were truthfully answered. Questions which would have produced answers defendants now say they should have been given were not asked. Plaintiff was not questioned concerning sources of income, military service, prior illnesses, prior medical examinations or the names of doctors who had examined him for any purpose. None of these questions, routinely found in interrogatories and depositions in personal injury litigation, can be found here. Plaintiff was not asked to produce, or authorize release to defendants, his income tax return for even one year to confirm his claim of lost income. This routine request would also have revealed plaintiff's reserve status. Defendants cannot complain that plaintiff did not volunteer answers which might have opened up these new inquiries.

The New Trial evidence did establish that plaintiff was a member of the Army Reserves when the case was heard. Defendants' New Trial witnesses also testified, however, that plaintiff's attendance at reserve meetings had been infrequent, that he attended only two or three hours at most once a month, that when he was seen he was in physical pain, holding his side, with grimacing facial expressions, and belching, that he would also call in on the telephone sounding weak and ill, stating he would not be there, and that he had been sent home ill. They also testified that during the annual training session plaintiff could only do work of a passive nature, at most 2 to 2½ hours per day, that he was observed ill, he couldn't eat, and was observed constantly belching and holding his side. Additionally, as a result of his Quadrennial physical examination on August 14, 1984, plaintiff was found to be "not qualified for retention" in the Army Reserves, and was discharged. This evidence cannot be considered so material that it would produce a different result on retrial. It could only strengthen plaintiff's evidence concerning the extent of his disability.

The judgment is affirmed.

SIMON, P.J., and STEPHAN, J., concur.