**Jerome C. DONZE, (Plaintiff) Respondent,**

v.

**Ira R. SWOFFORD, (Defendant) Appellant.**

**No. 31303.**

St. Louis Court of Appeals.

Missouri.

June 14, 1963.

Samuel Richeson, and Dearing, Richeson & Weier, Hillsboro, for appellant.

James H. Connor, Festus, and Thomas B. Maloney, St. Louis, for respondent.

ANDERSON, Judge.

This is an action by Jerome C. Donze, as plaintiff, against Ira R. Swofford, as defendant, to recover damages for personal injuries alleged to have been sustained on November 15, 1960, when an automobile driven by defendant ran into the rear of an automobile being operated by plaintiff. The trial resulted in a verdict and judgment for plaintiff in the sum of $6,000.00. Defendant has appealed from the judgment.

The accident in question occurred on Highway 61–67 in the City of Barnhart in Jefferson County. Said highway consists of four traffic lanes, two for southbound traffic and two for northbound traffic. Plaintiff was southbound traveling in the left lane next to the center line of the highway. Defendant was also proceeding southwardly in the same traffic lane as plaintiff, and was behind plaintiff. It was raining at the time, and water had accumulated in the low places

on the highway. Prior to the collision plaintiff had been traveling about 40 miles per hour, and while thus proceeding, observed a northbound schoolbus, with its lights flashing, stopped on the shoulder of the highway and unloading passengers. Plaintiff first noticed this bus when he was between 250 and 300 feet north of it. He thereafter brought his automobile to a stop with the front end of his car about even with the front end of the bus. He had been stopped about five or six minutes, waiting for the signal on the schoolbus to change, when his car was hit in the rear by defendant's automobile. Plaintiff had not seen defendant prior to the accident.

Defendant testified that he was southbound in the inner lane of the highway, traveling at a speed of 35 to 40 miles an hour. He stated that his automobile was in good mechanical condition; that the tires were good; and that the brakes, which were installed about 3 or 4 months previously, were also in good condition. He further testified that he was a "pretty good ways behind" plaintiff when he observed plaintiff's brake light go on, then off, then on again, and then saw plaintiff stop. He also saw the schoolbus on the opposite side of the highway. There were automobiles traveling on his right at the time. Plaintiff testified that when he stopped, there were two other vehicles along side of him on the outside and southbound lane that were also stopped. Defendant said he applied his brakes when he was 65 to 70 feet behind plaintiff. At that time he was traveling about 20 miles an hour. He gave the following testimony:

"Q. And then what happened when you applied your brakes and tried to stop?

"A. Well, I didn't have no brakes. I don't know what was wrong.

"Q. Do you know what happened to them?

"A. Well, they either got wet * *"

By the Court: "Do you know what, if anything, was wrong with your brakes?

"A. No, only they just wouldn't work. Now, that's all I know. * * *

"Q. All right. In other words, your brakes would not take effect when you applied the pedal?

"A. No.

"Q. Could you tell the jury how fast you were going when the * * * front end of your car came in contact with the back end of Mr. Donze's car?

"A. Oh, I couldn't have been going over ten, twelve miles an hour, maybe a little more, maybe a little less."

Defendant further testified that he made an effort to swerve his automobile to the left and that the right headlight and the right side of his car came into contact with the left rear of plaintiff's automobile. He stated that the pavement was wet, and that it had been raining hard since he left St. Louis, and that there was water on the road. He had no problem with the brakes prior to the collision. He further testified that plaintiff after the collision told the Highway Patrol that he was not hurt. Defendant's testimony was in many respects corroborated by that of his wife and brother, who were, at the time, passengers in defendant's car.

Plaintiff testified that as a result of the collision, he was thrown back and then forward and back again before his automobile settled down, about 60 feet forward from the place of impact. After the collision, the front seat was broken loose and was against the rear seat. Plaintiff said he suffered some lacerations on his leg and that his knee hurt him. He went to work that night and worked the midnight shift. When he awoke after going to bed, he found that he could not rise up or get out of bed. He had pain in the front of his neck; pain through the center of his body;

and pain in the back of the neck, hip and leg.

He first consulted his family doctor, Dr. Lutkewitte, who sent him to Perry County Memorial Hospital for x-rays. Dr. Lutkewitte then referred him to Dr. Maurice Roche of St. Louis, who sent him to the Ernst Radiologist Clinic in St. Louis, where x-rays were taken. Dr. Roche then referred him to Dr. Smolik of St. Louis. None of the above named doctors testified at the trial.

Plaintiff testified that as a result of his injuries, he was unable to carry on his part-time work of insurance agent, because he could not use a typewriter. Plaintiff was regularly employed by the U. S. Army Corps of Engineers, and worked as a deckhand on a dredge boat. Plaintiff stated his work was interfered with because he would lose power in his left hand. He testified he had occasional pain in his neck, frequent headaches, pain in his two fingers, and was unable to turn his head as far to the left as he desired. He further testified he had lost approximately 15 days from his employment, which time was mostly consumed in going to his doctors. He had enough sick leave and annual leave to cover this absence, and actually lost no money from employment as a result of the accident. He stated that his doctor bills amounted to $445.00, which included $275.00 to Dr. Schaerer, who examined him and testified at the trial, and $181.00 hospital bill, totaling $626.00. In addition he suffered damage to his automobile in the amount of $280.00; he lost a sack of potatoes worth $6.00; a barrel of a shotgun was bent, which cost $40.00 to repair, and $15.00 which was spent for towing his car.

Dr. Jacques P. Schaerer testified for plaintiff. He first saw plaintiff on May 5, 1961. Plaintiff was sent to Dr. Schaerer by his lawyer, the purpose being to establish a diagnosis. The doctor testified that on his first visit, plaintiff had unlimited motion in his neck and some tenderness to pressure over the front portion of the lower part of the cervical spine. The left biceps reflex was diminished. There was a strip of diminished sensation to pinprick extending from the hand over the ring and index finger into the arm and shoulder. There was diminished sensation to pinprick over the mid portion of the neck beginning in the midline in the back and extending to the left—about one-third of the way around the left side of the neck. The doctor testified that the complaints of the patient, plus the subjective and objective findings, indicated to him that plaintiff had sustained an injury to a disc in his neck. Dr. Schaerer next saw plaintiff on June 2, 1961, where an x-ray test (myelogram) was performed. The doctor testified he was not able to make a diagnosis on the basis of these x-rays. He then performed a "discogram", which consisted of sticking a needle into the center of the disc and the introduction of a solution that can be seen on an x-ray film, and would reveal any abnormality of the disc. He testified that from this test he diagnosed a ruptured disc at the C–4 and C–5 level.

Dr. Schaerer stated that in his opinion the accident of November 15, 1960 was a producing factor of the injuries to Mr. Donze which he had diagnosed, and that said injuries were permanent.

On cross-examination, Dr. Schaerer admitted that, as far as cervical discograms are concerned, he is the only doctor in the St. Louis area who uses this diagnostic procedure. He stated that when he first saw plaintiff on May 5, 1961, plaintiff had no limitation of motion of his neck; that when he again saw plaintiff on April 10, 1962, and treated him for his second automobile accident, which occurred in August of 1961, plaintiff complained of low back pain, and he found plaintiff, at that time, did have limitation of motion of the neck.

Defendant called Dr. Hugh Harting, who had made an x-ray examination of plaintiff, in co-operation with Dr. Huckstep, who examined plaintiff at defendant's request. Dr. Harting testified that he found only a very slight scoliosis, which could be attrib-

uted to positioning for the x-ray technician and some hypertrophic arthritis between the sixth and seventh vertebrae, a normal condition to be found in any man of plaintiff's age. He saw no evidence of injury to the neck. On cross-examination, he admitted he did not do a myelogram, a process used to determine whether or not there is a rupture of an intervertebral disc; that one could not see a protruding disc by use of the ordinary x-ray; that he did not find anything that would indicate that plaintiff had had a traumatic injury of any kind to his neck.

On re-direct examination, Dr. Harting examined Dr. Schaerer's x-rays, including the myelogram, and found no evidence of injury; that he saw no abnormality at the level of C–4 and C–5. He also testified that he was familiar with discogram diagnosis, which had been discarded many years ago at Barnes Hospital; that he believed that one or two people, including Dr. Schaerer, still use the method. He examined Dr. Schaerer's discogram x-rays, and testified he found no abnormality shown. He said that not enough dye had been injected to fill out the nucleus, and the examination was unsatisfactory.

Dr. Robert Huckstep testified on behalf of defendant. He stated that he had examined plaintiff and found a very slight tenderness on the right side of plaintiff's neck and his left arm. There was a voluntary limitation of motion of the neck to approximately 20 degrees, but motion to the right was good. He could find no atrophy of the neck muscles. There was no muscle spasm to indicate pain, tenderness, or soreness. There was no atrophy of the left hand or arm muscles. The strength of plaintiff's left hand and fingers seemed to be normal. The tendon reflex in both arms seemed to be normal. There was numbness of the fourth and fifth fingers of the left hand, which numbness extended up to about the wrist area. The doctor further testified that he could not say that plaintiff had or did not have a disc injury, but that it is possible that a disc could have caused the numbness.

He further stated that from the x-ray he felt that plaintiff had a small amount of hypertrophic arthritis in the cervical spine, which would cause pain in the neck. He also stated that it was possible that plaintiff could have a ruptured disc.

During plaintiff's direct examination, plaintiff was permitted to testify, over defendant's objection, that he had four children, and was allowed to testify as to their ages.

Appellant contends that the court erred in permitting plaintiff to testify, over defendant's objection, as to the names, number and ages of his children. On this point the transcript shows the following:

"Q. Will you state your name, please?

"A. Jerome C. Donze." * * *

"Q. And how old are you?

"A. Thirty nine." * * *

"Q. And do you have any children?"

By Mr. Richeson: "I object to that. It's irrelevant, immaterial and prejudicial."

By the Court: "No, overruled. Go ahead.

"A. Sir, that last question?"

By Mr. Conner: "Do you have any children?

"A. Yes.

"Q. How old are they? Their names and ages please.

"A. The oldest Jerome, Jr. is eighteen, David Paul, fifteen, Janice Ann, thirteen, Bruce Herman, nine." * *

By Mr. Richeson: "In order to preserve my record at this time I would like to ask the Court to discharge the jury and declare a mistrial on account of the injection of the prejudicial issue of the number of children which plaintiff has * * *."

By the Court: "Overruled."

For seventy-five years it has been the law in this state that it is improper to inquire of a plaintiff as to the number of children there are in his family. Among the many cases so holding are, Stephens v. Hannibal & St. J. R. Co., 96 Mo. 207, 9 S.W. 589, 9 Am.St.Rep. 336 (decided in 1888); Dayharsh v. Hannibal & St. J. R. Co., 103 Mo. 570, 15 S.W. 554, 23 Am.St. Rep. 900; State ex rel. Dick & Bros. Quincy Brewery Co. v. Ellison, 287 Mo. 139, 229 S.W. 1059 and Heibel v. Robison, Mo.App., 316 S.W.2d 238, decided by this court in 1958. It would seem that the bench and bar, by this time, would have become familiar with this rule but apparently they have not, for there are still many infractions of the rule.

The rule in question was adopted in order to secure a fair trial of the issues presented for adjudication. This cannot ordinarily be accomplished if irrelevant evidence, calculated to appeal to the sympathy of the jury, is admitted. By overruling a proper objection to such evidence, the court is, in effect, telling the jury that it is proper evidence for it to consider in deciding the issues properly before it.

In the case at bar there was a timely and proper objection made to this improper evidence, for it has been held that since such an inquiry is usually incompetent for any purpose, a general objection is sufficient. State ex rel. Dick & Bros. Quincy Brewery Co. v. Ellison, supra.

Nor can we hold, under the facts and circumstances of this case, that the error did not affect the merits of the action. If plaintiff's evidence concerning his injuries is to be believed, the verdict could not be said to be excessive. However, defendant's evidence would have warranted a much smaller recovery. In this state of the record, we cannot say that the incompetent evidence did not influence the jury, and that the error was, therefore, harmless.

Appellant's brief contains five additional assignments of error which are directed at the trial court's rulings during the course of the trial and to the size of the verdict. We do not consider it necessary to pass upon said rulings, since they may not arise upon a retrial; nor do we deem it necessary to consider the complaint that the verdict is excessive, since the judgment is being set aside.

The judgment is reversed and the cause is remanded for a new trial.

RUDDY, P. J., and WOLFE, J., concur.