Dwight **WILLIAMS, Kathryn Harr, and Frankie Reaves, Plaintiffs– Appellants,**

v.

**Charles D. McCOY, Defendant– Respondent.**

No. 17980.

Missouri Court of Appeals, Southern District, Division One.

April 23, 1993.

Motion for Rehearing or Transfer Denied May 6, 1993.

Application to Transfer Denied June 29, 1993.

H. Lynn Henry, Henry & Henry, West Plains, for plaintiffs-appellants.

Noble Leighton, Mountain Grove, for defendant-respondent.

SHRUM, Judge.

This is a suit for damages for the wrongful death of Joyce Williams who died from injuries she sustained when the motor vehicle she was driving collided with a vehicle driven by the defendant, Charles D. McCoy. The plaintiffs are Joyce Williams's

husband Dwight Williams and her daughters Kathryn Harr and Frankie Reaves.

Pursuant to a jury verdict, the trial court entered a judgment for the defendant. In revised order of presentation, we summarize the plaintiffs' preserved assignments of trial court error:

(1) Refusing to admit expert opinion testimony about the point in the roadway where the impact occurred while allowing the defendant and his passenger to testify about the point of impact;

(2) Denying the plaintiffs' request for a new trial, based on their claim of "newly discovered opinion evidence" concerning skid marks left by the defendant's tires;

(3) Permitting testimony about the "good driving record" of the defendant;

(4) Permitting the presence of the defendant's family in the courtroom during the trial; and

(5) Permitting cross-examination of Dwight Williams about a relationship he developed with a woman following his wife's death.

For reasons to be discussed, we reject the arguments made by the plaintiffs and affirm the judgment of the trial court.

## ISSUE: EXPERT OPINIONS OF POINT OF IMPACT

### Facts

The accident occurred at approximately 7:45 p.m., February 5, 1990, on U.S. Highway 60 in Howell County, Missouri, at a point about 502 feet west of the intersection of Route U and Highway 60. From the collision site to its intersection with Route U, Highway 60 runs downhill and curves gradually to the left. The portion of Highway 60 where the accident occurred is separated by double yellow lines into two driving lanes, one for eastbound traffic and one for westbound. The outer edge of each lane is marked with a white line; total roadway width inside the white lines is 23 feet 7 inches. Each lane has a paved shoulder exceeding 10 feet in width.

The deceased was driving a 1988 Pontiac Bonneville west on Highway 60 and the defendant was driving east in a 1983 International truck tractor, described at trial and elsewhere in the record as a "cabover" and a "bobtail". The vehicles collided head-on with a passenger-side-to-passenger-side initial contact. Following the impact, the Pontiac came to rest facing east in the eastbound lane, 141 feet east of the crash site, and the truck on its driver side just off the shoulder of the eastbound lane, 196 feet east of the crash site. With the exception of the occupants of the two vehicles involved, there apparently were no witnesses to the collision.

Missouri Highway Patrol Sergeant Tony Selvey arrived at the crash scene at 7:59 p.m. and investigated the accident for about two hours. The next day, Highway Patrol Sergeant James McNeill accompanied Selvey to examine the accident scene. McNeill also examined the Pontiac, which had been transported to West Plains.

Sixteen days after the collision, William Morton, the plaintiffs' accident analyst, met with the plaintiffs' lawyer and sergeants Selvey and McNeill at the accident scene. At that time McNeill marked the highway surface with green paint to show the location of tire skid marks.

At trial, most of the testimony of Selvey, McNeill, Morton, the defendant, and the defendant's passenger concerned evidence from which the jury could determine the location of the vehicles relative to the centerline of the highway at the time of collision.

### Testimony About Skid Marks

There were two parallel tire skid marks on the road surface, caused by one of the pairs of tires on the rearward set of dual wheels on the defendant's truck. There were no skid marks from the Pontiac. A principal question concerning the truck's skid marks was whether they were produced by a pair of tires on the driver side or the passenger side.

The skid marks, of unequal length, ran at an angle to the normal direction of travel on the roadway. From Selvey's testimony, we learn that the northernmost mark, the longer of the two, measured 17 feet 3 inches. It began at a point 9 feet 7 inches

north of the inside of the white line marking the outside edge of the eastbound lane and ended on the southernmost of the two yellow lines. The shorter of the skid marks, 9 feet 8 inches in length, ended simultaneously with the longer one. During cross-examination by the defendant's attorney, Selvey stated his opinion that "the driver's side left the skids" but on redirect examination said, "I can't tell you exactly for sure that it's left or right side." Selvey said he did not believe impact occurred "during the skid" because there were no "jerk marks" in the skid marks. McNeill said he thought the collision took place "at the end of the skids." McNeill was not asked his opinion about which pair of tires left the skid marks.

Asked by the plaintiffs' attorney for his opinion of the position of the defendant's truck "with respect to the skid marks," Selvey said the "right front of the tractor-trailer would have been near the center line, which would have been between the two yellow lines if there would have been a center line there" and that the driver side front of the truck would have been "approximately six or seven feet" into the westbound lane.

Accident analyst Morton said it was "inconclusive" whether the skid marks were caused by tires on the driver side or the passenger side of the truck. He said his earlier deposition opinion that it was a driver side skid was based on "the trooper's report." His computer-assisted analysis, which took into account such factors as the measurements of the vehicles and the collision contact points, gave him "a reading more to the [passenger side]."

### Relation of Curvature and Superelevation of Road to Skid Marks

Selvey, McNeill, and Morton testified about the relationship between the curvature and superelevation of the road and the skid marks. They agreed that as a vehicle negotiates a curve at speeds of 50 to 55 miles per hour its weight shifts to the "outside" of the curve, and the side of the vehicle with the greater weight produces more heat and darker skid marks. In Selvey's words, "The side that's got the most

pressure on it will leave the darker skid, provided there are skids on both sides." Selvey and McNeill said an eastbound vehicle traveling 50 to 55 miles per hour through the curve where the accident occurred would have experienced a weight shift to the outside of the curve, which would have been the passenger side of the vehicle.

### Gouge Marks in Road Surface

One of the plaintiffs' exhibits was a photograph of the accident scene showing gouge marks in the road surface. The photograph shows one gouge mark between and parallel to the yellow lines in the center of the road and numerous other pavement gouges, in a semi-circular pattern, beginning on the northernmost yellow line and occurring only in the westbound lane. From bituminous material adhering to the bottom of the Pontiac, Selvey and McNeill concluded the gouge marks were made by the Pontiac and that the linear gouge mark between the yellow lines was caused by the Pontiac's driver side frame rail. Selvey testified he measured the distance between the gouge marks and the end of the tire skid marks to be 10 feet 5 inches. Both officers testified that, in their opinion, the gouge marks were made upon impact, Selvey saying the impact "drove the car down almost immediately."

Morton agreed with Selvey and McNeill that the gouge marks resulted from the immediate downward movement of the Pontiac upon impact and that the linear gouge mark between the yellow lines was caused by the driver side frame rail on the Pontiac.

### Other Evidence at the Crash Site

Selvey testified fuel was spilled at the accident scene. He said the fuel spill was in the westbound lane "near the area of impact.... And then it came back into the eastbound lane." Selvey said he found glass from a driver side window of the Pontiac in the eastbound lane, slightly east of the gouge marks. He stated his opinion "that, on impact, that when the car started folding up, that the window broke out" in a manner "similar" to an explosion.

### Point of Impact Testimony

During the testimony of Selvey and McNeill, the trial court sustained defense objections to the plaintiffs' attempts to elicit testimony about "the area where you believe the collision occurred," "the area of impact," and "the area of this collision." The court struck a reference by Selvey to "the point of impact." Asked by the plaintiffs' lawyer (over the objection of defense counsel) where he would "place the front passenger corner . . . of the tractor, at the time of the collision," McNeill responded, "I'd put it across the center line." Without objection from defense counsel, Morton testified he had "no basis to disagree" with Selvey and McNeill that the front passenger side corner of the truck was between the yellow lines "when this occurrence took place." Given the width of the truck—nearly eight feet—Morton estimated the truck had intruded 60 to 61 inches into the westbound lane.

The defendant and his passenger, William Turnbow, also testified about the place in the roadway where the impact occurred. Both men said it was dark at the time of the accident, both vehicles had their headlights on, there were no other vehicles in sight, and the truck was traveling at a speed of 50 to 55 miles per hour.

Turnbow said he saw the Pontiac in the westbound lane when it was about 100 yards away, a distance he described as "a guess." He had returned his attention to the right side of the road where he was "looking for deer" when "Charles hollered, 'Bill, the car's in our lane.' And I looked up and it was—almost instantly, we hit." Just before the impact, Turnbow felt the truck swerve to the left. When the vehicles collided, Turnbow said, "[t]he car was directly in the—be the eastbound lane."

The defendant testified he first saw the headlights of the Pontiac when it was 100 to 150 yards away in the westbound lane and that he never took his eyes off it. When the Pontiac was about 50 or 60 feet

away it "suddenly pulled over into the eastbound lane." The defendant "hit [his] brakes" and "cut to the left side." He said he swerved to the left because the Pontiac was headed toward his right side and swerving left was the "only possible way" to avoid a collision. He said that at the time of impact his truck was in the eastbound lane, near the yellow line and the Pontiac was "pretty much totally in the eastbound lane."

Although the jury instructions are not in the record, from the closing arguments we learn the plaintiffs' verdict director hypothesized the defendant's truck was on the wrong side of the road and that he was thereby negligent. Defense counsel argued to the jury that if the defendant "acted correctly in trying to swerve right—I mean left, instead of trying to go right, and he got on the wrong side, that's not negligence." The jury returned a verdict assigning 100% of the fault for the accident to Joyce Williams.

### Discussion and Decision

■ In Point III the plaintiffs contend the trial court erred in various rulings regarding "point of impact" evidence, specifically

> in refusing to allow plaintiffs' expert and the troopers to testify regarding point of impact, where time and motion studies, laws of physics regarding weight and velocity, perception and reaction times, and braking and sight distances were all beyond the ken of the average juror, and where the court applied a double standard by allowing defendant and his brother-in-law to testify regarding point of impact.[1]

Relying on *Housman v. Fiddyment*, 421 S.W.2d 284 (Mo.banc 1967), *Yocum v. Kansas City Public Service Co.*, 349 S.W.2d 860 (Mo.1961), and *Rose v. Fague–Prouhet*, 701 S.W.2d 509 (Mo.App.1985), the plain-

---

1. In this and other points relied on, the plaintiffs complain of trial court rulings on motions in limine presented by both sides. The trial court's rulings were not appealable. *See Midwest Materials Co. v. Village Development Co.*, 806 S.W.2d 477, 496[27] (Mo.App.1991); *Rob-*

*bins v. Jewish Hospital of St. Louis*, 663 S.W.2d 341, 348[14] (Mo.App.1983); and *Jones v. Jones*, 661 S.W.2d 817, 818[1] (Mo.App.1983). We have reviewed the plaintiffs' complaints that were properly renewed at trial.

tiffs assert that "Missouri Courts have consistently held that expert testimony concerning point of impact is admissible when the expert's opinion is based upon technical, mathematical or mechanical knowledge." In making their argument, the plaintiffs misconstrue their cited authorities.

In *Housman* our supreme court held that the trial court abused its discretion in admitting an expert's opinion "as to the position of the [defendant's vehicle] immediately prior to the collision and as to the place of the point of impact." 421 S.W.2d at 290–91[6].

These subjects do not involve an application of the principles of physics, engineering, mechanics or other technical fields of science requiring specialized information. These questions could be determined by jurors possessed of the knowledge of ordinary men of the time. Automobile collision cases involving these subjects of inquiry are routinely decided by Missouri juries without the aid of expert witnesses.

. . . .

There was no necessity of resorting to the specialized knowledge and experience possessed by an expert in order for the jury to have reached a reasonably accurate conclusion on the single issue presented in this case. In these modern days nearly all jurors are experienced motorists. Marks and debris on highways at the scenes of collisions, examples of the damage done when automobiles collide and the results of the interaction of vehicles colliding are matters of common observation. As a result the modern-day juror in the average case is "just as capable of reasoning backward from the evidence and making a correct analysis of what happened as is the expert."

*Id.* at 291–92 (quoting *Carmody v. Aho*, 251 Minn. 19, 86 N.W.2d 692, 697 (1957)).

In *Yocum*, a case involving a collision between a truck and a bus, our supreme court concluded the trial court did not abuse its discretion in permitting the defendant's expert to state his opinion that, based on "the 'turning radius' of the truck and the photographic evidence showing the place on each of the vehicles where it came into contact with the other, the collision could not have occurred in the manner testified by plaintiff [but] could have occurred as defendant contended." 349 S.W.2d at 864. As the supreme court interpreted the expert's testimony, "he did not undertake to point out or to state that the impact occurred at any particular point upon the pavement." *Id.* The court continued:

[U]nder the circumstances here shown, we cannot with conviction say that the ordinary juror would be possessed of knowledge of the course plaintiff's truck (having a turning radius of 27 feet) would pursue along the highway in turning into the driveway from points 15 or 20 feet south of the driveway entrance, computed respectively from the two lanes of traffic in controversy, and, thereafter, upon consideration of the point at which each vehicle came into contact with the other, reckon the mathematical and mechanical probability of the accuracy of the conflicting versions of the parties as to the manner in which the collision was produced.

349 S.W.2d at 864–65.

As in *Yocum*, in the case before us the experts were properly permitted to testify about matters that required specialized knowledge, to offer various opinions that required that knowledge, and to explain the significance of much of their testimony. However, evidence upon which the experts would have based their opinions "that the impact occurred at any particular point upon the pavement" was before the jury which possessed the knowledge necessary to accurately place the vehicles at the instant of collision.[2] *Housman* is controlling, and the trial court did not err in

2. As noted, the jury heard expert opinion testimony about the location in the roadway of the defendant's truck "at the time of the collision" and "when this occurrence took place." We do not speculate about the ramifications of this testimony had the jury returned a verdict for the plaintiffs.

excluding expert opinion evidence about the point in the roadway at which the vehicles collided.[3]

The plaintiffs argue that *Housman* and other cases that exclude point of impact expert testimony "are inapposite and in fact have been superseded by statute." The statute to which the plaintiffs refer, § 490.065, RSMo Supp.1989, provides in pertinent part:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

The plaintiffs emphasize the portion of subsection 2 that provides that an expert opinion "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," and they argue that "an objection that such evidence invades the province of the jury is no longer proper."

The "ultimate issue" language in subsection 2 is not new. Long before § 490.065 was enacted, Missouri courts recognized that "[i]f the subject is one with which lay jurors are not likely to be conversant, and one where the expert's opinion would be of value to the jury, it is no valid objection that the expert's opinion is upon the ultimate issue to be decided by the jury, or that it invades the province of the jury." *Wessar v. John Chezik Motors, Inc.,* 623

S.W.2d 599, 602[1] (Mo.App.1981) (citing *Eickmann v. St. Louis Public Service Co.,* 363 Mo. 651, 253 S.W.2d 122, 129–30[8] (1952)).

Section 490.065.2 follows Rule 704(a) of the Federal Rules of Evidence and existing Missouri case law. William C. Hopkins, "Expert Testimony: New Rules, New Questions," 46 Mo.Bar J. 175, 176 (1990). In the notes following Rule 704, the Advisory Committee on Proposed Rules stated:

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions *which would merely tell the jury what result to reach,* somewhat in the manner of the oath-helpers of an earlier day. (Emphasis added.)

■ Although § 490.065.2 makes clear that an expert's opinion "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," the subsection also makes clear that the expert's opinion must be "otherwise admissible." As we observed in *Stucker v. Chitwood,* 841 S.W.2d 816 (Mo.App.1992):

An overall reading of the statute makes it clear that even if the witness is an expert and has an opinion, those two factors alone will not make the opinion admissible. There is the additional requirement that scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue.

**3.** In *Rose,* cited to us by the plaintiffs, the court of appeals held that where the plaintiffs did not first establish that only a person with the qualifications of their expert was able to interpret photographs of the plaintiffs' and defendant's vehicles following their collision, the trial court properly excluded the expert's opinion of how the accident occurred where his opinion was based solely on his examination of the photos. 701 S.W.2d at 511–12[3]. How *Rose* aids the plaintiffs eludes us.

The plaintiffs also call our attention to *McDowell v. Kawasaki Motors Corp. USA,* 799 S.W.2d

854 (Mo.App.1990), in which the court recounted that an accident reconstruction expert "testified primarily concerning the reconstructed positions of the vehicles at impact." *Id.* at 865[15]. The relevant issue in *McDowell,* and the reason for the reconstruction, was not the point in the road of the impact of the vehicles; rather, it was whether a part on the motorcycle built by the defendant was defectively designed and whether that part injured the plaintiff. *McDowell* is of no assistance to the plaintiffs.

*Id.* at 819[4]. There is nothing in § 490.065 that nullifies the principle stated in *Housman* that, regarding the position of the vehicles in the roadway immediately prior to the collision, "the modern-day juror in the average case is 'just as capable of reasoning backward from the evidence and making a correct analysis of what happened as is the expert.'" 421 S.W.2d at 292. Under *Housman,* an expert's opinion on point of impact is not "otherwise admissible"; thus § 490.065.2 does not apply.

Finally, the plaintiffs argue that the trial court erroneously applied a "double standard" by permitting the defendant and his passenger to testify about where the vehicles collided. This argument has no merit.

■ The defendant and his passenger testified as eyewitnesses, not as experts. "[A] witness may testify to what he hears, feels, tastes, and smells, as well as what he sees...." 97 C.J.S. *Witnesses* § 53 at 442 (1957). Moreover, "a lay witness may testify about perceptible facts which tend to show where an accident occurred." *Fieser v. Snyder,* 797 S.W.2d 752, 754[3] (Mo.App. 1990). The eyewitness testimony of the defendant and his passenger about the location of the Pontiac immediately prior to the collision was admissible, as were the experts' eyewitness observations about the location of such evidence as skid marks, debris, vehicle damage, and gouge marks. We know of no rule of evidence that requires the trial court or this court to "balance" the quantity or quality of the evidence on both sides of an issue. Point III is rejected.

### ISSUE: "NEWLY DISCOVERED OPINION EVIDENCE"

#### *Facts*

The plaintiffs filed a motion for a new trial, asserting numerous grounds, including "newly discovered evidence" that officers Selvey and McNeill "were of the opinion that the dual skids left by the McCoy tractor were not left by the driver's side duals, as testified to at trial, but rather were left by the passenger side rear duals...." The plaintiffs asserted that these revised opinions were not developed until after trial "due largely if not entirely to the failure of Sergeant Selvey to include a critical measurement of 10'5″ separating the gouge marks from the ending point of the skid marks onto his official accident report" and that the plaintiffs' attorneys had questioned Selvey "on multiple occasions prior to trial with regard to the critical measurement...."

At a hearing on the new trial motion, Selvey testified that the 10–foot 5–inch measurement of the distance from the end of the skid marks to the gouge marks did not appear in his motor vehicle accident report, that until the day of trial he had repeatedly told plaintiffs' counsel that a record of that measurement did not exist, and that upon his discovery of the measurement in his field notes (a few minutes before he testified at trial), he reported the measurement to the attorneys for the plaintiffs and the defendant.

Selvey and McNeill testified at the hearing that after post-trial consultation with Highway Patrol accident reconstruction specialists they believed the skid marks were made by tires on the passenger side of the defendant's truck. Selvey described the 10–foot 5–inch measurement as "important" and agreed it was "part of what changed [his] mind," but he said that what confirmed his present opinion was that, because of the weight shift of the truck as it negotiated the curve to the left, if there had been driver side skid marks, there also would have been passenger side skid marks. Because there were skid marks from one side only, the marks must have come from the passenger side.

McNeill said that after he and Selvey testified at trial, he tried to reconstruct the collision using graph paper, templates, and the 10–foot 5–inch measurement and concluded the skid marks could not have been made by tires on the driver side of the defendant's truck. McNeill described the 10–foot 5–inch measurement as "crucial" and said without it he could not correctly determine which pair of tires caused the skid marks.

On cross-examination, both Selvey and McNeill recalled that the defendant's attorney had told them, months before trial, that a Robert McKinney had measured the distance between the end of the skid marks and the gouge marks, although neither remembered what the measurement was.[4]

### Discussion and Decision

We quote the plaintiffs' Point VI assignment of error:

> The trial court committed reversible error in failing to grant a new trial based on newly discovered opinion evidence where, based upon an omission of a critical measurement from an accident report, and where upon ascertaining the critical measurement, the troopers both made after trial affidavits and both testified that their trial opinions were in error and that the tractor duals which left the skids were not the driver's side duals as testified to by them at trial but rather the skids were left by the passenger side duals, thereby putting the tractor on the wrong side of the road at the time of the collision and not in the eastbound lane as testified to by defendant and his brother-in-law.

■ New trial motions on the ground of newly discovered evidence are not favorites of the law; they are viewed with disfavor and courts grant them as an exception and refuse them as a rule. *Carthen v. Jewish Hosp. of St. Louis*, 694 S.W.2d 787, 800[13] (Mo.App.1985). *See also State ex rel. Missouri Hwy. Comm'n. v. Bloomfield Tractor Sales, Inc.*, 381 S.W.2d 20, 25 (Mo.App.1964). "They are entertained reluctantly, examined cautiously and construed strictly." *Carthen*, 694 S.W.2d at 800[13]. A trial court has broad discretion in ruling on motions on such grounds, and an appellate court will interfere only where that discretion has been abused. *Bloomfield Tractor Sales*, 381 S.W.2d at 25–26[9].

■ A party seeking a new trial on the ground of newly discovered evidence must show: (1) The evidence came to his knowledge since trial, (2) due diligence would not have uncovered the evidence sooner, (3) the new evidence is so material it would probably produce a different result if a new trial were granted, (4) the new evidence is not cumulative only, (5) an affidavit of the witness must be produced or its absence accounted for, and (6) the object of the evidence may not be to impeach the character or credit of a witness. *Young v. St. Louis Public Service Co.*, 326 S.W.2d 107, 111[5] (Mo.1959); *Carthen*, 694 S.W.2d at 800–01.

A threshold question in this case is whether the plaintiffs have alleged the existence of new evidence. We believe the plaintiffs' motion is similar to that of the plaintiff in *Deacon v. City of Ladue*, 294 S.W.2d 616 (Mo.App.1956). Of the new trial motion in *Deacon*, the court said:

> Plaintiff's motion for new trial suggests no new witnesses nor new evidence as such, but rather suggests only that some ... of defendant's witnesses who testified at the trial were mistaken in their testimony, and now would testify in favor of plaintiff, and that other of defendant's trial witnesses ... have had their expressed opinions proven wrong by the passage of time.

■ Despite our belief that the plaintiffs have alleged nothing more than mistaken testimony and opinions proven wrong by the passage of time, we have examined the record and concluded that the plaintiffs have failed to satisfy certain of the requirements set out in *Young*, 326 S.W.2d at 111, and *Carthen*, 694 S.W.2d at 800–01.

Underlying the plaintiffs' claim of "newly discovered opinion evidence" is their argument that "neither the Troopers nor Plaintiffs' expert William Morton were apprised of this critical [10–foot 5–inch] measurement in sufficient time to fairly ascertain its significance nor to realize that the misplaced measurement would in fact alter their trial opinions as to which set of duals, driver's or passenger's side, left the skids."

---

**4.** McKinney was hired by the defendant to investigate the accident. Portions of McKinney's June 26, 1991, deposition were read into the record at trial by the plaintiffs' counsel as a part of the plaintiffs' case-in-chief.

We conclude that, by due diligence, the plaintiffs could have obtained the 10–foot 5–inch measurement long before the day of trial. Sixteen days after the accident, the plaintiffs' lawyer and expert witness Morton met sergeants Selvey and McNeill at the scene at which time McNeill marked the location of the skid marks. Apparently the plaintiffs' lawyer and their expert did not avail themselves of this opportunity to measure between the skid marks and the gouge marks.

The McKinney deposition is an additional indication of a lack of diligence concerning the 10–foot 5–inch measurement. The defendant's brief contains the following passage from that deposition, a passage not read to the jury:

PLAINTIFFS' ATTORNEY: Approximately how far west of the gouge marks was this scuff mark that you said you can see on the photographs?

MCKINNEY: There was an outline of blue paint around the area that this gouge mark appears in the photograph, I mean the tire mark, and I believe, I think that that was about ten feet between the gouge marks approximately in the blue tire marks or the blue line that would indicate the tire mark, sir.

Although the above-quoted excerpt from McKinney's deposition was not in evidence, the plaintiffs, in their reply brief, do not dispute the defendant's argument that the measurement of "about ten feet" mentioned in McKinney's deposition was available to them at least as early as June 26, 1991, the date of the deposition and four months prior to trial.

Had the plaintiffs exercised due diligence, they would have discovered what they characterize as a "critical measurement" in ample time for the Highway Patrol officers and accident analyst Morton to have incorporated that measurement into their original opinions.

Moreover, the record refutes the plaintiffs' assertion that the 10–foot 5–inch measurement was, indeed, "critical." This "critical" measurement is not what caused Selvey to change his opinion about which pair of dual tires caused the skid marks. Although he described the 10–foot 5–inch measurement as "important," it is apparent from his testimony at the new trial hearing that Selvey's revised opinion was based for the most part on the absence of a second pair of skid marks, the significance of which Selvey testified about at trial.[5]

Whatever the significance of the 10–foot 5–inch measurement might have been to Selvey, we are not persuaded his revised opinion about the source of the skid marks would have produced a different result at trial. Selvey testified at trial that "with respect to the skid marks" the passenger side front of the defendant's truck was between the yellow lines and the driver side front had encroached six or seven feet into the westbound lane; McNeill's testimony placed the front passenger corner of the tractor "at the time of the collision" across the center line. Accident analyst Morton's testimony placed the front passenger side of the truck between the yellow lines "when this occurrence took place" and he testified to an estimated intrusion of at least five feet by the truck into the westbound lane. Selvey, McNeill, and Morton agreed that the gouge marks, all but one of which were entirely in the westbound lane, resulted from the immediate downward movement of the Pontiac upon impact. McNeill was not asked his opinion about which pair of tires caused the skid marks; neither Selvey nor Morton was adamant about the marks' having been caused by the driver side dual tires. Virtually all expert testimony (including the two opinions about the location of the truck upon impact) contradicted the testimony of the defendant and his passenger about which side of the centerline of the roadway the vehicles were on at the instant of impact.

---

**5.** McNeill's characterization of the measurement as "critical" to a determination of which pair of dual tires caused the skid marks is irrelevant because at trial he was not asked which tires caused the marks. It would be illogical to assume that earlier knowledge of the measurement by McNeill somehow would have caused one of the attorneys to ask McNeill his opinion about which tires made the skid marks.

An opinion by Selvey that the skids marks were from the passenger side of the truck would have added little to the mass of expert testimony presented to the jury.

The trial court did not abuse its discretion in overruling the plaintiffs' new trial motion. Point VI is rejected.

## ISSUE: EVIDENCE OF DEFENDANT'S GOOD DRIVING RECORD

### Facts

During cross-examination, the following exchange occurred:

PLAINTIFFS' COUNSEL: Is it possible that you were exceeding the speed limit, you were going faster than 50 or 55?

DEFENDANT: No. No, sir. I do not speed. You—my traffic record in the state of Missouri or all over—

PLAINTIFFS' COUNSEL: We object to that.

DEFENDANT: —will show you that there was not no other tickets.

PLAINTIFFS' COUNSEL: That's improper. He knows it. And we ask that it be stricken from the record.

The court overruled the motion to strike and the plaintiffs' subsequent motion for a mistrial.

### Discussion and Decision

■ In Point I the plaintiffs contend the trial court erred in its refusal to strike the defendant's "good driving record" comments and its denial of their motion for a mistrial. The plaintiffs rely on *Williams v. Bailey*, 759 S.W.2d 394 (Mo.App.1988), which states the general rule that, because evidence that a person was previously a good driver does not tend to establish that he was not negligent at the time of the accident in question, such evidence is inadmissible. *Id.* at 396[2].

■ As the plaintiffs acknowledge, *Williams* makes clear that the admission of evidence of a person's good driving history, absent a showing of prejudice, does not mandate reversal. 759 S.W.2d at 397.

We conclude the prejudice exhibited in *Williams* does not exist in this case. In *Williams*, defense counsel elicited testimony from witnesses about defendant school bus driver Bailey's good driving record and character. Then defense counsel underscored the significance of that evidence by commenting in the presence of the jury that the plaintiffs were "trying to convict" Bailey and by emphasizing Bailey's good driving record and good character in closing argument. Defense counsel's argument thereby "exploited improperly admitted evidence for the purpose of eliciting sympathy, thus insuring the prejudicial effect of the evidence." 759 S.W.2d at 397–98[8].

In contrast to the facts in *Williams*, in the case before us the defendant, during a vigorous cross-examination, volunteered an inadmissible statement in response to a question about whether he was speeding at the time of the accident. The "good driving record" testimony was not extensive; the single exchange quoted above was all the jury heard of the defendant's driving history during the two-day trial. Following the trial court's rulings on the motions to strike and to declare a mistrial, defense counsel made no reference, during testimony or closing argument, to the defendant's driving record, and the defendant said nothing else about his driving history.

By an extensive new trial motion and by written and oral argument the plaintiffs renewed their complaint to the trial court that the "good driving record" testimony was prejudicial to their case. With the benefit of hindsight and having heard all the evidence, the trial court again rejected the plaintiffs' argument.

■ Absent a showing of an abuse of discretion, we defer to the trial court, which is " 'far better able to judge whether the trial has been fair than is the court that reviews the record.' " *Farley v. Johnny Londoff Chevrolet, Inc.,* 673 S.W.2d 800, 804 (Mo.App.1984) (quoting *Benjamin v. Metropolitan Street Ry. Co.,* 245 Mo. 598, 151 S.W. 91, 97 (1912)). Based on the record, we find no abuse of the trial court's discretion. Point I is rejected.

### ISSUE: COURTROOM PRESENCE OF DEFENDANT'S FAMILY

■ In Point II, the plaintiffs contend the trial court erred in not excluding the defendant's family from the courtroom.[6]

The plaintiffs rely on the general rule that in an action for compensatory damages for personal injury, evidence that a party has children "is incompetent on any issue, not only because irrelevant, but because calculated to appeal to the sympathy of the jury." *Lewis v. Hubert*, 532 S.W.2d 860, 868[16] (Mo.App.1975); *see also Donze v. Swofford*, 368 S.W.2d 917, 921[1] (Mo. App.1963).

With the exception of the closing argument reference to the "McCoys," the plaintiffs admit no direct references were made during trial to the defendant's family. Nevertheless, they argue, "By permitting the McCoy family to sit before the jury the trial court permitted Defendant to do indirectly that which cannot be done directly. By allowing Defendant to place his family in full view of the jury throughout the trial the Defendant injected his family status into the case regardless of whether defense counsel made any reference to Defendant's family status."

During the two-day trial the plaintiffs did not bring to the attention of the trial court any conduct by the defendant's family that would have tended to arouse the sympathy of the jury or otherwise taint their decision. In effect, the plaintiffs would have us declare that the presence at trial of the defendant's family was, as a matter of law, prejudicial. This we decline to do.

■ Whether the presence of the defendant's family in the courtroom unduly aroused the jury's sympathy and whether they should have been excluded are matters for the discretion of the trial court. *Petty v. Kansas City Public Service Co.*, 355 Mo. 824, 198 S.W.2d 684, 689 (1946). *See also Walton v. Unites States Steel Corp.*, 362 S.W.2d 617, 626[8, 9] (Mo.1962),

and *Garrison v. Ryno*, 328 S.W.2d 557, 568–69[16] (Mo.1959). Nothing in the record or the plaintiffs' argument persuades us the trial court abused its discretion. Point II is rejected.

### ISSUE: CROSS—EXAMINATION OF PLAINTIFF DWIGHT WILLIAMS

#### Facts

Points IV and V involve allegations that the trial court erred in allowing defense counsel to cross-examine the plaintiff, Dwight Williams, concerning his relationship with Susie Riley, a relationship which was formed after the death of Dwight's wife, Joyce. We consider these points together because of their common factual thread.

During direct examination Dwight testified that when he and Joyce began dating, he became a member of her church, was elected an elder, and at the time of trial was an elder. He said he "also served on ... the session ... that organized the church or runs the church."

On cross-examination, Dwight was asked about an elder's qualifications and moral values, whether an elder had to "believe in marriage," and whether an elder would be permitted to "live with someone outside of marriage...." Dwight then admitted he had lived with Susie Riley "for the last several months."

#### Discussion and Decision

■ In Point V the plaintiffs contend the trial court erred in allowing defense counsel "to impeach the character of Dwight Williams" by asking him about his relationship with Susie Riley. As the plaintiffs point out:

> Generally, the character of a party is irrelevant in a civil action and cannot be inquired into if not put in issue by the nature of the proceeding, such as libel, slander, malicious prosecution, etc.,

---

**6.** As a part of this point on appeal, the plaintiffs complain of a reference by defense counsel to the "McCoys" during closing argument. Because the plaintiffs did not make a timely and sufficient objection to the trial court about defense counsel's statement, we do not review the complaint. *See, e.g., MFA Inc. v. Dettler*, 817 S.W.2d 658, 662[1] (Mo.App.1991).

where damage to character or reputation is an issue. The reason that evidence on the collateral issue of character is inadmissible is that it comes with too much dangerous baggage of prejudice, distraction from the issues, and surprise.

*Williams*, 759 S.W.2d at 396[1] (citations omitted).

Exceptions exist. "[A] party may impeach or contradict on matters brought out on *direct* examination." *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 661[5] (Mo.App. 1991) (emphasis in original).[7] On direct examination Dwight introduced evidence of his church activities, evidence that might have tended to evoke sympathy from the jury, bolster his credibility before the jury, or enhance his character. His testimony brought in evidence that was collateral to his relationship with his wife Joyce. The defendant had the right to impeach or contradict Dwight on those collateral matters raised by Dwight on direct examination. Point V is rejected.

■ In Point IV the plaintiffs contend that the cross-examination of Dwight Williams about his relationship with Susie Riley violated the collateral source rule. They rely on *Johnson v. Pacific Intermountain Exp. Co.*, 662 S.W.2d 237, 238–39 (Mo.banc 1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984); *Iseminger v. Holden*, 544 S.W.2d 550, 552–54 (Mo.banc 1976); and *Schiles v. Schaefer*, 710 S.W.2d 254, 274–75, 66 A.L.R.4th 465 (Mo.App.1986).

We take the plaintiffs' argument to be a claim that the evidence elicited by the cross-examination tended to mitigate damages by showing that Susie Riley was performing the household services previously performed by Dwight's deceased wife Joyce. We find no merit to Point IV for several reasons.

■ We have determined that evidence of Dwight's relationship with Susie Riley was admissible for the purpose of impeaching or contradicting Dwight concerning his character.

It is the general rule in a jury case that where evidence is admissible for one purpose or one issue, but would be improper for other purposes or other issues, it should be received, and the objector then has the right to an instruction, if he requests it, limiting the extent to which and the purpose for which the jury may consider such evidence.

*Dyer v. Globe–Democrat Publishing Co.*, 378 S.W.2d 570, 581[7] (Mo.1964). *See also Ransom v. Adams Dairy Co.*, 684 S.W.2d 915, 918[5] (Mo.App.1985) (wrongful death action by widow in which trial court allowed defense counsel to cross-examine widow about specific acts of violence by her husband). Where, as here, no request is made for a limiting instruction, no error exists when the trial court does not give the instruction. *Dyer*, 378 S.W.2d at 581[7]; *Ransom*, 684 S.W.2d at 918[6]. These principles alone warrant rejection of Point IV.

■ Furthermore, the matter complained of in Point IV bears only on the extent of the plaintiffs' damages. The jury found Joyce Williams to have been 100% at fault. In such instance the "well-established rule here applicable is that 'where evidence or argument is before the jury clearly bearing only upon the issue of the extent of plaintiff's damages, and the jury's verdict demonstrates that the jury has failed to reach that issue, plaintiff is not prejudiced thereby.'" *Beesley v. Howe*, 478 S.W.2d 649, 653 (Mo.1972) (quoting *Merritt v. Mantony*, 353 S.W.2d 768, 769 (Mo.1962)).[8] Point IV is

---

**7.** The distinctions between "impeachment" and "contradiction" would not affect this appeal. For a discussion of those distinctions, see *Talley v. Richart*, 353 Mo. 912, 917–18, 185 S.W.2d 23, 26[6] (1945); *D.K.L. by K.L. v. H.P.M.*, 763 S.W.2d 212, 219[4] (Mo.App.1988); and *Maugh*, 818 S.W.2d at 661[4].

**8.** In their reply brief the plaintiffs cite us to *Spengel v. Kantor*, 736 S.W.2d 51 (Mo.App.

1987), a wrongful death action based on medical malpractice. In *Spengel*, the court of appeals reversed a verdict for the defendant because the trial court did not permit plaintiff's counsel to argue to the jury that the plaintiff had paid the medical and funeral expenses of his deceased spouse. Recognizing the general rule that "the non-liability verdict would render a ruling on the question of damages not prejudi-

rejected.[9]

The plaintiffs withdrew Point VII at oral argument.

The judgment for the defendant is affirmed.

PARRISH, C.J., concurs in part; concurs in result in part in separate opinion.

CROW, P.J., concurs.

PARRISH, Chief Judge, concurring in part and concurring in result in part.

I concur in the result reached and in the parts of the principal opinion other than the discussions regarding Points IV and V. I respectfully dissent from the discussion with respect to those points.

Appellant's Point IV asserts error by the trial court in overruling objections to questions related to appellant's living arrangement with a woman to whom he was not married. The trial court permitted respondent's counsel to ask appellant if the woman had lived in his home. After having obtained an affirmative answer, respondent's counsel told the jury, in closing argument, "[Appellant] hasn't lost a penny from household services. Not before he married her, he's never hired anyone to come in and keep his house, and he hasn't since, because Susie Riley is keeping his house for him."

Appellant's claim that the inquiry was improper by reason of the collateral source rule is correct. A wrongdoer is not entitled to have damages reduced by proving that a plaintiff will be indemnified for the loss from a collateral source. *Iseminger v. Holden,* 544 S.W.2d 550, 552 (Mo. banc 1976). It is of no significance that the woman with whom appellant lived was not married to him. *See City of Bloomington v. Holt,* 172 Ind.App. 650, 361 N.E.2d 1211, 1219 (1977).

I am unable to agree with the principal opinion's analysis that the inquiry about appellant living with Susie Riley was permissible to "impeach or contradict on matters brought out on *direct* examination." In my opinion, reliance on *Maugh v. Chrysler Corp.,* 818 S.W.2d 658, 661 (Mo.App. 1991), for that proposition is misapplied. The fact that appellant testified about church activities in which he became involved with his deceased wife was not sufficient to provide license to respondent's counsel to present evidence about appellant's subsequent living relationship with Ms. Riley. If counsel had evidence that appellant had not participated in the activities he claimed, the principles upon which *Maugh* was based would have permitted such evidence. Counsel went beyond what *Maugh* permits. In my opinion, Point IV was well-taken.

Although counsel's conduct in attempting a thinly veiled character attack is reprehensible, in view of the verdict, it was not prejudicial. The jury assessed 100% of fault to respondent. Therefore, there was no issue as to damages. As stated in the principal opinion, the questionable evidence impacted only damages. For that reason, I concur in the result reached regarding Point IV. The verdict demonstrates that, insofar as the trial's outcome is concerned, appellant was not prejudiced by the trial court's erroneous ruling.

Point V goes to the same trial conduct to which Point IV referred. Appellant contends that the trial court erred in permitting respondent's counsel "to impeach" appellant's character by asking questions about appellant's relationship with Ms. Ri-

---

cial," the court stated, "This proposition is not applicable where the only evidence to support the extent of damages came in the testimony of a witness who also was the only witness on the key fact of non-treatment necessary to support a finding of liability." *Id.* at 52. Here, evidence of damages came from various sources, and no evidence on liability came from Dwight. *Spengel* does not support the plaintiffs' argument.

9. In their argument, the plaintiffs complain about defense counsel's argument to the jury

that Dwight Williams "hasn't lost a penny from household services ... because Susie Riley is keeping his house for him." Plaintiffs' complaint is not preserved for our review because their attorney did not object to the argument when it was made, *Dettler,* 817 S.W.2d at 662[1], and the issue was abandoned when it was omitted from the point relied on. *Livingston Manor, Inc. v. Department of Social Services,* 809 S.W.2d 153, 157[5] (Mo.App.1991).

ley. Appellant's testimony regarding his participation in church activities did not warrant respondent's counsel's inquiry. Respondent's counsel's improper attack on appellant's character is improper because appellant's character was not a matter that was put in issue by the nature of his cause of action. Appellant's character was irrelevant to the issues before the court. *Williams v. Bailey,* 759 S.W.2d 394, 396 (Mo.App.1988); *see also Reynolds v. Jobes,* 565 S.W.2d 690, 694 (Mo.App.1978).

Notwithstanding the foregoing, appellant's testimony was directed to the issue of damages. He was not a witness to the fatal collision; thus, the evidence presented by his testimony did not bear on the determinative issue in the case, i.e., liability. For that reason, as with respect to Point IV, I do not conclude the error that was committed was prejudicial. I therefore concur in the result reached with respect to Points IV and V. In all other respects, I concur in the principal opinion.